488

Janis Osvald DOMBROVSKIS, Tomislav Dragoievich, Bozidar Dunich, Ernest Vilhelms Elerts, Nikolo Grancaric, Sime Grancaric, Joso Grando, Mate Gregov, Krizan Ivanov, Slavko Jezina, Ljubo Komadina, Ivan Latkovic, Cesar Malesic, Sime R. Martinovich, Sime Matesic, Joso Patrk, Svetko Petric, Ante Spaleta, Pere Stojak, Giovanni Stroligo, Sime Telac, Joseph Zuzich and Frank Pavlak, Plaintiffs,

v.

P. A. ESPERDY, District Director, Immigration & Naturalization Service, United States Department of Justice, Defendant.

United States District Court
S. D. New York.
March 13, 1961.

See also D.C., 24 F.R.D. 302.

Edith Lowenstein, New York City, for plaintiffs.

S. Hazard Gillespie, Jr., U. S. Atty. for the Southern Dist. of New York, New York City, Roy Babitt, Sp. Asst. U. S. Atty., New York City, of counsel, for defendant.

DIMOCK, District Judge.

Motions for summary judgment have been made by plaintiffs and by defendant. In an opinion dated June 29, 1960, I granted defendant summary judgment dismissing plaintiffs' first claim, see D.C., 185 F.Supp. 478, and that claim is not now before me. I also granted plaintiffs' cross-motion to the extent of postponing and continuing the hearing of defendant's motion for summary judgment on the second claim in order to give plaintiffs an opportunity to take the depositions of certain persons. Plaintiffs have now completed the taking of depositions and have cross-moved for summary judgment.

Plaintiffs' applications for stays of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), have been denied. Plaintiffs contend that they have been victims of unlawful prejudgment of their cases by the Attorney General based on their status as crewmen. They seek relief by way of declaratory judgment and injunction. Plaintiffs are alien seamen, nationals of Yugoslavia or Latvia who reside in this country, and are admittedly deportable as illegal entrants or as temporary entrants who overstayed the period allowed them for shore leave.

Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), provides as follows:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."

The pertinent administrative regulation reads in part:

"If the request for a stay of deportation is predicated upon a claim by the alien that he would be subject to physical persecution if deported to the country designated by the Service, he shall be requested, upon notice, to appear before a special inquiry officer for interrogation under oath. The alien may have present with him, at his own expense, during the interrogation any attorney or representative authorized to practice before the Service. The alien may submit any evidence in support of his claim which he believes should be considered by the special inquiry officer. Upon completion of the interrogation, the special inquiry officer shall prepare a written memorandum of his findings and a recommendation which shall be forwarded to the regional commissioner together with all the evidence and information submitted by the alien or which may be applicable to the case. The alien shall be served with a copy of the special inquiry officer's memorandum and recommendation and shall be allowed five days from date of service within which to submit written representations to the regional commissioner. If the alien refuses to appear for interrogation before a special inquiry officer when requested to do so or waives his appearance, all the pertinent evidence and available information in the case shall immediately be submitted to the regional commissioner. The decision whether to withhold deportation and, if so, for what period of time shall be finally made by the regional commissioner upon consideration of all the evidence submitted by the alien and any other pertinent evidence or available information." 8 C.F.R. 243.3 (b) (2).

■ The scope of judicial interference with the Attorney General's denial of stays of deportation is limited to cases where the alien has been denied procedural due process, or has not been afforded fair consideration of his application. E. g., United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 218 F.2d 316; see United States ex rel. Dolenz v. Shaughnessy, 2 Cir., 206 F.2d 392. A claim that plaintiffs' applications were prejudged on the basis of their

status as crewmen would, if substantiated, warrant a conclusion that the applications had not been fairly considered. Plaintiffs have failed, however, to substantiate their claim.

In my original opinion dealing with defendant's motion for summary judgment, I found that the recommendations and orders of denial of plaintiffs' applications indicated on their face that there had been fair consideration of the applications. I incorporate here that finding, 185 F.Supp. 478, 483–484:

"Plaintiffs' contention that the records are irrelevant is without foundation. The records of the plaintiffs who applied for withholding of deportation and have not withdrawn their applications or asked that they be held in abeyance [3] reveal

_____

3. It is possible that some plaintiffs have not exhausted their administrative remedies with respect to the grievances alleged in the second claim, but defendant declines to make an issue of this saying: 'If there is any substance with respect to the allegations in the second cause of action, we are not disposed to suggest that because these plaintiffs did not proceed to exhaust their remedies and to proceed to final determination, they would not have standing to sue. See, Joint Anti-Facist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817. On the other hand, however, if it be shown by the defendant that there is no merit to the allegations of the complaint and that those applications which have resulted in final orders were decided on their merits without regard to the applicant's manner of entry into the United States, then those plaintiffs who have not reached the final administrative stage have no cause for complaint and the balance of the plaintiffs in whose cases final orders have entered must be denied relief as a matter of law.'

_____

that an officer of the Immigration and Naturalization Service conducted an examination of each applicant and filed a 'Memorandum and Recommendation of Special Inquiry Officer'. In all but one of the cases which have been acted upon by the Regional Commissioner of the Immigration and Naturalization Service, the Special Inquiry Officer wrote out findings and conclusions and recommended denial of the application, and the Regional Commissioner stated that 'upon consideration of the entire record' the application was denied. In the one remaining case, that of Giovanni Stroligo, the Special Inquiry Officer recommended granting the application, but the Regional Commissioner ordered denial and detailed his reasons for so doing. The contents of these records have a clear tendency to show that the applications were determined on the merits. Each applicant's claim of physical persecution was thoroughly discussed and evaluated by the Special Inquiry Officer in his statement of findings and conclusions and also by the Regional Commissioner in the case of Giovanni Stroligo. The fact that the applicant was a crewman was mentioned in each 'Memorandum' but there is not the slightest indication that the applicant was discriminated against because of that fact. A shadowy inference that the Special Inquiry Officer who prepared the 'Memorandum' in the case of Ante Spaleta was perhaps influenced in his decision by the manner in which Spaleta had entered the United States might be drawn from the statement in his 'Memorandum' that Spaleta had 'entered the United States in deliberate evasion of the immigration laws of the United States'. Whatever this inference is worth, however, it would go only to the question of whether the legality of his entry was considered and would not be probative of the claim that his application was denied because of his occupation as a crewman."

The eleven plaintiffs who had their applications for stays denied suffered these denials during 1958. On October 21, 1956, J. M. Swing, the Commissioner of Immigration, issued an order deferring final action on the application for a stay of the deportation of one John Martinovich, a Yugoslav native and citizen, as well as on the applications and

deportations of all other Yugoslav nationals who were found to be in circumstances similar to those of Martinovich. This had the effect of a stay of deportation as well. The purpose of this deferral of action was to allow the collection of reliable information concerning possible persecution on the part of the Yugoslav Government. Martinovich's circumstances were described as follows:

"Applicant asserts that as a Roman Catholic layman and as one who is personally opposed to Communism on political grounds and has never shown any sympathy for the Tito regime, he would be exposed to harsh treatment by the Communist authorities in Yugoslavia. Applicant admits, however, that no members of his family in Yugoslavia have been persecuted by the regime and that he has never actively or openly opposed Communism or the Tito regime."

Several of the plaintiffs had final action deferred on their applications pursuant to the Martinovich decision. On February 1, 1958, the Commissioner of Immigration withdrew the Martinovich order, and the results of the inquiry into the situation in Yugoslavia were set forth in The Matter of Kale, decided on April 23, 1958, by the Assistant Commissioner of the Enforcement Division. The Kale decision stated in part:

"Discussion: While specifically disavowing that the responsibility or burden of proof in an application for stay of deportation based on physical persecution under Section 243(b) of the Act rested with this Service, an order was entered on October 31, 1956 deferring final decisions on all applications under that section until July 1, 1957 (later extended to January 1, 1958) in order that certain information with respect to Yugoslavia might be obtained and considered in passing on individual applications. By order of February 1, 1958 the Regional Commissioners were directed to resume adjudicating such applications. The

application of the subject, one of the first such, has been certified to this office for review and decision.

"From various sources, including the personal observations of officers of this Service in that country, it has been established that: The Government of Yugoslavia is completely under the domination and control of the Communist Party of Yugoslavia and the economic and political philosophy of the country differs only in degree from that followed in the USSR and its satellite countries. Advancement in almost any line of activity is, with few exceptions, limited to Party members. The basic freedom to criticize, as we know and enjoy it, does not exist in Yugoslavia.

"On the other hand, churches throughout the country are open for public worship and religious assembly and they are being maintained and repaired, obviously with Government permission, if not with its approval or support. It must also be recorded that the Yugoslav regime granted asylum to thousands of anti-Communist Hungarians fleeing the latter country, and it refused to repatriate them involuntarily, while assisting in arrangements to settle them in western countries.

"The above are established facts. We will not analyse or comment on them or on the motives which might have brought them into being. They are merely reported as a background to the consideration of this case.

"The rebuttal of the subject's allegations that he would be physically persecuted upon his return to Yugoslavia is best furnished by this recital of his own history. A previous deportee from the United States, following five years of residence in this country, he was able without let or hindrance thereafter to sail out of Yugoslav ports, in possession of Yugoslav documents. During the peri-

od of his Yugoslav residence, from the ten years prior to his most recent deliberate evasion of our immigration laws, neither he nor his family were molested. There is no evidence of reprisals against them since this third desertion from a Yugoslav Merchant Vessel.

"The subject has stated that he might be punished for this desertion upon return to Yugoslavia. Such a possible punishment is not the physical persecution contemplated by the statute. Physical persecution contemplates incarceration or subjection to corporal punishment, torture, or death based usually on one's race, religion or political opinions. Conviction followed by imprisonment for crimes, cognizable as such under generally recognized civilized juridical systems, is not physical persecution. Economic sanctions applied against those not members of the controlling clique in a country whose economic system is completely and rigidly state-controlled is not physical persecution. These last two are the most this man alleges that he fears and these, based on his own testimony, we find improbable. In short, this application is completely without merit and deserving of no further consideration.

"In passing, it is proper to note that this application has achieved a purpose common to many of the applications for discretionary relief recently and cynically filed with the Service—it has delayed for over a year a well-merited deportation. This abuse of the administrative processes, which have been set up to guarantee the most careful and sympathetic consideration of legitimate, well-founded claims on this Government's liberality, is becoming notorious.

"ORDER: It is ordered that the application for a withholding of deportation to Yugoslavia pursuant to Section 243(h) of the Immigration and Nationality Act be denied."

On May 7, 1958, the Kale decision was sent to all regional commissioners of the service together with the following forwarding letter:

"                                CO 243.35–P
"May 7, 1958
"All Regional Commissioners:
"Burlington, Vermont; Richmond, Virginia
"St. Paul, Minnesota; San Pedro, California
"Frank H. Partridge, Assistant Commissioner
"Enforcement Division, Central Office
"Section 243(h) Applications—Yugoslav Aliens

"Attached hereto is a copy of the order entered in the case of Rudolf Kale, A9 555 532, a Yugoslav alien who entered the United States as a crewman. Interrogations pursuant to 8 CFR 243.3(b) (2) should be accorded all Yugoslav aliens who request a withholding of deportation under Section 243(h). However, the special inquiry officer should be instructed to prepare memoranda and recommendations only in the cases of Yugoslav nationals who have entered as crewmen subsequent to 1945, and who have been in Yugoslavia at some time since that date. In those cases in which recommendations are made, the decisions are to be made by your office based upon the criteria set forth in the attached order.

"Memoranda of findings, recommendations, and decisions in the cases of Yugoslav aliens of classes other than that specified above should be held pending further instructions from this office, and consideration given in appropriate cases to eligibility under Section 15 of the Act of September 11, 1957 coupled with preexamination.
"Attachment     Frank H. Partridge
                                "WHP
"LTC:bw"

On May 13, 1958, the Regional Commissioner for the Northeastern region, where all the plaintiffs have filed their applications, repeated the substance of the letter just quoted in a communication transmitted to all his district directors. The same directions were issued by the Northeast Regional Special Inquiry Officer to all special inquiry officers in his area. Eight months later, on January 21, 1959, the regional commissioners and special inquiry officers were instructed to prepare findings, recommendations and decisions in the cases of Yugoslav nationals who were not seamen.

Plaintiffs assert that the Kale decision, which constituted the sole precedent decision dealing with section 243(h) relief in the cases of Yugoslav nationals, was in reality a general policy directive requiring denial of such relief to Yugoslav seamen regardless of the merits of the individual cases. The documents already considered establish, however, only that the decision was to be employed as a policy directive regarding the meaning of "persecution" in the Yugoslav context. This definition of persecution was directed to be applied in all cases of Yugoslav nationals.

Plaintiffs cite official use of the word "order" in reference to the Kale decision as evidence of a direction that it be followed in all cases irrespective of their facts. As appears from the form of its last paragraph, supra, the Kale decision is an order. No sinister inference that it is to have the effect of an order in cases other than its own can be drawn from the use of its correct name.

As I have said, all the documentary evidence cited thus far establishes only that the Kale decision was issued as a precedent on the meaning of persecution in cases of Yugoslav nationals, just as a decision of the Supreme Court is designed to have general application in cases involving similar facts before lower federal courts. The additional evidence supplied by plaintiffs fails to create any inference that the Kale decision was either calculated to, or did in fact, elicit slavish adherence to a policy of denying all stays of deportation to Yugoslav crewmen. The records of plaintiffs whose applications were denied contained substantial evidence upon which findings could be made that their cases fell squarely within the ambit of Kale. It could be found from the evidence that plaintiffs were ordinary lay communicants in the Catholic Church whose families in Yugoslavia had not been molested and who had not themselves been molested while in Yugoslavia. It could also be found that while plaintiffs professed to be anti-Communist their professions had never been loudly proclaimed and were unsupported by membership in anti-Communist organizations.

No inference of prejudgment can be based on the fact that opinions denying the applications of two plaintiffs incorporated verbatim the general discussion of persecution contained in Kale, since application of the general Kale criteria would be quite consistent with untrammeled judgment of the facts of the individual case. Nor is it significant that applications by some plaintiffs for nonquota refugee visas made under section 6 of the Refugee Relief Act of 1953 on the ground of persecution had been approved in previous years by regional commissioners, for the Kale decision defined persecution differently from the way in which the term had been defined under the Refugee Relief Act, which requires only "fear of persecution" (see 50 U.S. Code Appendix § 1971d).

Plaintiffs also rely on a memorandum of a telephone conversation, on August 6, 1958, between defendant Esperdy and an official of the Central Office of the Immigration Office. The memorandum reads:

" CO 243.35–C
"August 6, 1958
"MEMORANDUM FOR FILE:
"Physical Persecution—Yugoslavia
"Mr. Esperdy, Deputy Regional Commissioner, Southeast Regional Office, telephoned this date and asked for an interpretation of our

memorandum to all Regional Commissioners, dated May 7, 1958, file CO 243.35–P. He was particularly concerned as to an interpretation of the sentence which directed that the decisions be made based upon the criteria set forth in the Kale order. He inquired as to whether the memorandum required that the decisions incorporate the language of the Kale decision, or whether a decision may use language patterned after this order. I informed him that it was my opinion that the exact language might not be pertinent to each case, and that the language could only be patterned upon the Kale decision.

"Louis T. Cates<br/>"L. T. Cates

"LTC:sfr"

While the matter is irrelevant, since defendant Esperdy was never Northeastern Regional Commissioner and hence never passed on any of plaintiffs' applications and is not shown to have attempted to influence any special inquiry officers in the New York district, the memorandum does not indicate any prejudgment. There was no indication that the language of the Kale decision should be used where not applicable to the facts of the particular case.

Defendant, pursuant to plaintiffs' request, has supplied statistics indicating the number of applications for stays of deportation under section 243(h) which were granted or denied to Yugoslav nationals from January 1, 1958 until March 1, 1960. The statistics do not include cases pending as of January 1, 1958, and closed during the year 1958, since defendant stated that the records of these cases were not available to him. During the period covered, eighty-seven Yugoslav seamen were denied stays and two were granted them, while ten non-crewmen Yugoslav nationals were denied stays and two were granted them. No Yugoslav seamen were granted stays in the Northeast region, although it was decided after the Kale decision not to retry the merits of the stays which were granted to two Yugoslav seamen prior to Kale. These statistics have no significance either way in this action and could obtain significance only if the record in each individual case were reviewed. There is no reason to believe that the high percentage of denials is due to anything except the results of an investigation which showed that political persecution of those who took no active part in politics was unusual in Yugoslavia.

Plaintiffs contend that, even if the wording of the decisions does not reveal a prejudgment of the cases of crewmen, the statements and conduct of the officials of the Immigration and Naturalization Service demonstrate it. With commendable zeal, resourcefulness and skill counsel for plaintiffs has made use of all of the discovery procedure at the command of a litigant in an effort to find support for this thesis. The depositions of four officials have been taken and discovery of many documents has been had.

One of the fruits of plaintiffs' investigation is a statement made by Immigration Commissioner Swing before the House Appropriations Committee as follows:

"The alien crewman continues to be a problem. During 1959, 13,627 deportable crewmen were located. To combat illegal entries at seaports, mobile investigative teams were strengthened on the east and west coasts. These investigators, organized as striking forces for early detection of deserters and stowaways, were moved along coastal shipping areas where need existed to augment permanent staffs. New York and San Francisco were designated as control points for smuggling and stowaway activities for each coast. Information and intelligence regarding crewmen and shipping are controlled and sent to proper Service offices. This permits detection of potential desertions before arrival. In deportation proceedings against crewmen, examining officers representing the Service are vigorously opposing and defeating claims for

discretionary relief." (Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 86th Congress, Second Session, by the Subcommittee on Departments of State and Justice, the Judiciary and Related Agencies Appropriations for 1961, pp. 404–411.)

From the examination of witnesses it appeared that the examining officers to whom Commissioner Swing referred were those who represented the Government in hearings before a special inquiry officer upon applications for adjustment of status under section 245 or for voluntary departure under section 244(e). No examining officer appears for the Government in proceedings such as those involved here under section 243(h) where the only issue is the alien's situation with respect to persecution.

The witnesses made no attempt to deny, however, that the Immigration Service, in its capacity as a law enforcement agency, directed special efforts to close the avenue of ship desertion as the easiest way to evade the immigration laws and, wherever the Service was represented as a litigant before a special inquiry officer, urged that strict compliance with the law be required.

The ease with which an alien can ship on a voyage to the United States and then convert his shore leave into residence here was recognized in the amendment made in 1960 to section 245 which deals with adjustment of status of aliens who lawfully entered the country. Under the old form of the section its benefits were available to crewmen but by section 10 of Public Law 86–648, 74 Stat. 505, effective July 14, 1960, the words "other than an alien crewman" were inserted.

Plaintiffs point to operations instructions with respect to section 245 as it existed before the 1960 amendment denied to crewmen the privilege of adjustment of status. The instructions direct that pending cases involving crewmen shall be adjudicated on the basis of the old law but remark: "Generally, such cases involving crewmen will continue to be denied in the exercise of a sound discretion or on the basis of mala fide nonimmigrant status at the time of entry". This statement did no more than recognize the situation as it existed under the statute. The old form of section 245 required as a qualification for relief that the applicant had been lawfully admitted as a bona fide nonimmigrant and was continuing to maintain that status. Section 101(a) (15) (D) qualified as a nonimmigrant alien "an alien crewman serving in good faith as such * * * who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft;". The task of proving that a crewman landed solely in pursuit of his calling and intends to depart from the United States is well nigh impossible. Once he has permitted his ship to depart without him it is hard to believe that he did not land for the purpose of becoming a resident of the United States or that he intends to leave. In describing such pending cases it was quite natural to say that although they would continue to have the chance of a stay that the old law gave them, generally they would continue to be denied.

Even in the proceedings here involved under section 243(h) where the Service is not represented as a litigant by an examining officer, crewmen may, in the nature of things, find themselves in a special class. A man's claim that he will be persecuted if sent to Yugoslavia is bound to be suspect if he has been plying unscathed back and forth between his country and Yugoslavia. It was on that basis that, for a time, a non crewman's application for a stay of deportation on account of probable persecution would be held up with a consequent postponement of deportation while a crewman's application would be processed in due course. That occurred after the Immigration Service had made a special investigation of conditions in Yugoslavia with respect to religious and political persecution. As announced in the order

in the Martinovich case on October 31, 1956, every application made by a crewman or anyone else under section 243(h), where there was any question of possible persecution, was held up with consequent postponement of deportation. The investigation was made thereafter and its results formed part of the basis of the decision in the Kale case on April 23, 1958. Accompanying copies of the order in the Kale case, directions were sent to special inquiry officers to proceed with the cases of Yugoslav crewmen who had entered the United States after 1945 and had been in Yugoslavia after that date. On January 21, 1959, the instruction not to process the other applications was rescinded. This order to take up first the claims in the backlog that seemed most likely to contain the seeds of their own denial does not constitute evidence that the cases were prejudged.

Another bit of evidence advanced as an indication that the applications of Yugoslav crewmen were prejudged as a letter written by Congressman Emanuel Celler on June 4, 1957, with respect to one of plaintiffs and a Chinese crewman. Congressman Celler recommended that a proceeding under section 243(h) should be brought but added, "There has been a blanket order issued by the Attorney General regarding this type of case and it could be that next year the Committee will review the entire situation of the Chinese and Yugoslavia seamen who claim that they are unable to return to their country of birth". At the time that the letter was written there was in effect the deferral of decision and deportation in the Martinovich and all other similar cases pending investigation in Yugoslavia. It is fair to assume that it was this order and not any prejudgment of crewmen's cases to which Congressman Celler referred.

■■ Plaintiffs' instances of alleged prejudgment of crewmen's cases do not, therefore, add up to proof of its existence. On the positive side, however, is the fact that the record in the case of each plaintiff, without the aid of any presumption against a crewman, amply supports the finding that the plaintiff has failed to establish that he will be subject to physical persecution.

■ While plaintiffs' motion for summary judgment must thus be denied I cannot say that they might not be able to establish their claim upon a trial and so, under the rule in this Circuit, see American Auto Ass'n v. Spiegel, 2 Cir., 205 F.2d 771, certiorari denied 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391, defendant's motion for summary judgment is also denied.

So ordered.