Chris DUNAT, Appellant,

v.

L. W. HURNEY, District Director of Immigration, Philadelphia.

No. 13307.

United States Court of Appeals Third Circuit.

Argued Feb. 20, 1961.

Decided May 29, 1961.

Reargued Nov. 14, 1961.

On Reargument Jan. 24, 1962.

---

Herbert S. Levin, Philadelphia, Pa., for appellant.

Charles M. Donnelly, Asst. U. S. Atty., Philadelphia, Pa. (Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before KALODNER, STALEY and FORMAN, Circuit Judges.

STALEY, Circuit Judge.

This appeal requires us to determine whether the Attorney General correctly interpreted the applicable statutory standard in denying an application for stay of a deportation order and, upon our determination that he failed to do so, the power of this court in the matter.

Dunat, a Yugoslav seaman who jumped ship in Norfolk, Virginia, in 1956, applied to the Attorney General under the provisions of subsection 243 (h) of the Immigration and Nationality Act, 8 U.S.C.A. § 1253(h)[1] for stay of an admittedly valid deportation order. Evidence was introduced in support of the application at a hearing before a special inquiry officer, where Dunat urged that he would be "physically persecuted" if deported to Yugoslavia since its Communist dominated government would deny him an opportunity to earn a livelihood because of his adherence to and practice of his Roman Catholic faith. The special inquiry officer's recommendation that a stay be denied was followed by the Regional Commissioner.

Dunat commenced an action in the district court for an indefinite stay of deportation, contending there, as he does here, that the Attorney General's action on his application was arbitrary and capricious and therefore constituted an abuse of discretion. In entering summary judgment in favor of the Attorney General and denying the stay, the district court concluded that "the applicant has been afforded all the rights he is entitled to, i. e., the rights of procedural due process. [Citing case.] We cannot say that the alien's evidence was so strong that failure to withhold deportation amounts to a failure to consider the evidence." D.C. E.D.Pa.1960, 183 F.Supp. 349, 351. This appeal followed.

Recently, on February 2, 1961, this court had occasion in Blazina v. Bouchard, 286 F.2d 507, to examine the role of the federal courts in reviewing a refusal by the Attorney General to grant a stay under subsection 243(h), 8 U.S. C.A. § 1253(h). We there said that an applicant has a right to have the application considered, and that such consideration must be given in conformity with the pertinent regulations promulgated by the Attorney General himself.

---

1. "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which is his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." § 243(h), 8 U.S.C.A. § 1253(h).

The application may not be denied arbitrarily or capriciously, or be based on grounds that show a *disregard of the law.*

 In denying Dunat's application, the Attorney General, acting through his designees, said the following in construing the phrase "physical persecution": "The fact that the applicant might be denied employment for church membership or for failure to join the Communist Party is likewise not within the import of the term 'physical persecution.'" We think that this was an erroneous interpretation of that phrase. Statutory construction is a question of law, Norton v. Warner Co., 1944, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430, and such questions, Justice Frankfurter said in O'Leary v. Brown-Pacific-Maxon, Inc., 1951, 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483, are "peculiarly appropriate for independent judicial ascertainment." On not infrequent occasions, statutory standards involved in deportation proceedings have been independently construed by the courts. E. g., McGrath v. Kristensen, 1950, 340 U.S. 162, 71 S.Ct. 224, 231, 95 L.Ed. 173 ("residing in the United States"); Fong Haw Tan v. Phelan, 1948, 333 U.S. 6, 68 S.Ct. 374, 92 L.Ed. 433 ("sentenced more than once"). There is no basis for thinking that Congress gave the Attorney General the exclusive right to interpret the statute. Furthermore, construction here does not require nor is it facilitated by any administrative expertise, a reason frequently given for judicial deference to an agency's interpretation of statutory language. The phrase "physical persecution" which is involved here is one that has a readily ascertainable meaning.

In Blazina, we defined "physical persecution" as meaning death, torture, or confinement inflicted on account of race, religion, or political viewpoint. Here, the Attorney General defined this phrase incorrectly by emphasizing, at the expense of all else, the means used to bring about a result, rather than the result itself. To belittle economic sanctions regardless of their impact was, we think, to bypass the realities of everyday life. The statute does not concern itself with the manner in which physical persecution is inflicted, so long as that is the net effect of the forces or the circumstances that the Yugoslavian government will impose. Economic sanctions that may tend to lead to social ostracism, or deny one an opportunity to obtain and enjoy some of the social niceties and physical comforts certainly is not within the ambit of that phrase. However, there is no basis for thinking that "physical persecution" requires or even connotes the use of intense physical force applied to the body with all the dramatics of the rack and wheel. The denial of an opportunity to earn a livelihood in a country such as the one involved here is the equivalent of a sentence to death by means of slow starvation and none the less final because it is gradual. The result of both is the same, and it is one that Congress, motivated by the humanitarian instincts that have always characterized our conduct and that of our civilization, certainly hoped to avoid when subsection 243 (h) was enacted.

The testimony adduced before the special inquiry officer established that if returned to Yugoslavia, Dunat will be "physically persecuted" because of his religious beliefs.[2]

2. Dunat's testimony in relevant part was as follows:

"Q. Are you a member of any recognized church? A. Yes.

"Q. And while in Yugoslavia did you attend church services? A. Under what I would call old Yugoslavia I attended church but under this new regime I did not because the idea was if I went to church I would not get work. Now my wife does attend church and my children for that reason are not able to obtain employment of any kind and I have to support them all.

\* \* \* \* \*

"Q. Is it your testimony you have not attended church in Yugoslavia since the new regime took over Yugoslavia? A. I was home very little and, of course, as I said before, if I went to church I would

We have examined many decisions which reviewed the action of the Attorney General in refusing a stay under subsection 243(h) and other analogous provisions. We find them clearly inapposite, for there the courts were called on to determine whether the applicant had been afforded procedural due process, or that the Attorney General had abused his discretion in failing to give proper weight to evidence in the record.[3]

"lose my place on the list as far as work was concerned.

 * * * * *

"Q. * * * Will you please tell me and explain in detail the basis for your claim that you would be subject to physical persecution in that country? A. As far as I know I am sure I would be jailed. Aside from that I am sure I would get no more employment so there is no other way to live and support my family. That much I am sure of. Also while I was on the ship any time I was on the ship I was always . . . they always tried to make me to become a member of the Communist Party. They always tried to work around but I always got out of it. I had to work. If I stayed on the ship I would lose my job because they knew I did not want to become a member and for that reason I can't go back. * * *

 * * * * *

"Q. Were members of your family persecuted themselves because they refused to sign such papers? [Papers to the effect that signer was not a member of any church.] A. No, I would not say hurt physically but they refused to leave them to have any kind of work or means of support."

Reverend Anthony Cecich testified that he is presently Assistant Pastor of St. James Roman Catholic Church, Ventnor, New Jersey, was expelled from Yugoslavia by the Communists in 1943 and came to the United States in 1946, and further that he became an American citizen in 1952 and has frequent contact with individuals in Yugoslavia. His testimony in relevant part was as follows:

"Q. What has the attitude of Tito's government been on the Catholic worshippers you served from which Mr. Dunat comes and more specifically what are the economic and political results of practicing your Catholic religion in his section of the country? A. First, as active Catholic in Yugoslavia, outside your farming business, farming job, you are not allowed, never given an opportunity to have any other government job.

"Q. Just farming? A. Farming and your own farm. Second, position in the government never could come for one who expresses . . . Catholics and go to church.

"Q. Could never get a government job? A. Could not get a government job. If any school teacher try to go to church first thing lose job. Second thing will go voluntary work, without pay, without decent meals.

 * * * *

"Q. * * * What, if anything, would happen to a ship jumper like Mr. Dunat who failed to join the Communist Party aboard ship and whose family refused to sign a paper renouncing religion if he returned to Yugoslavia at the present time? A. In Yugoslavia never have job, family no job, persecuted all the time. Take job from him.

"Q. Would he be physically persecuted? A. I am sure physically persecuted because I know many of them who went back, put in jail, and physically persecuted. * * *

 * * * * *

"Q. Has the government as a matter of practice refused employment to those who practice their religion? A. Generally everybody."

In addition, the testimony of Dr. Fran Gjupanovich, formerly an Attorney General Deputy for Croatia, and Justice of the Court of Appeals in Novy Sod, Yugoslavia, and Professor Bogdan Raditsa, formerly Chief of Press Services in the Yugoslavian Embassy in Washington, and Chief of the Foreign Press Department under Tito, given in a similar but unrelated proceeding, was incorporated in the record and examined by the special inquiry officer. That testimony, as summarized without challenge in appellant's brief, clearly establishes beyond the peradventure of doubt, that physical torture and inhumane treatment would greet Dunat upon his return to Yugoslavia as punishment for his desertion or retribution for his religious beliefs.

3. Chao-Ling Wang v. Pilliod, 7 Cir., 1960, 285 F.2d 517; Oakmar v. Hoy, 9 Cir., 1959, 265 F.2d 59; Namkung v. Boyd, 9 Cir., 1955, 226 F.2d 385; United States ex rel. Dolenz v. Shaughnessy, 2 Cir., 1953, 206 F.2d 392; United States ex rel. Ratkovic v. Esperdy, D.C.S.D. N.Y.1960, 185 F.Supp. 806; Civadelic v. Bouchard, D.C.D.N.J.1960, 185 F.Supp. 439; United States ex rel Miletic v. District Director of Immigration, D.C. S.D.N.Y.1952, 108 F.Supp. 719.

It is necessary to determine what disposition we shall make of Dunat's petition in light of our holding on the merits. On several occasions courts after reviewing executive action under provisions similar to the one involved here have ordered that relief be granted to the alien identical to or the equivalent of that requested from the executive officer or agency. Such disposition took place not only where there was a failure to exercise discretion, Dickhoff v. Shaughnessy, D.C.S.D.N.Y.1956, 142 F. Supp. 535 (enforcement of deportation order enjoined and action remanded); Acosta v. Landon, D.C.S.D.Cal.1954, 125 F.Supp. 434 (release from detention ordered); but also where it was improperly exercised, Cheng Fu Sheng v. Barber, 9 Cir., 1959, 269 F.2d 497 (release from detention ordered); Sang Ryup Park v. Barber, D.C.N.D.Cal.1952, 107 F.Supp. 603 (enforcement of deportation order enjoined), and Sang Ryup Park v. Barber, D.C.N.D.Cal.1952, 107 F.Supp. 605 (release from detention ordered). The rationale of those decisions is that though a court may not suspend or stay a deportation order as that power is vested exclusively in an executive officer or agency, still as a condition precedent to the enforcement of such order, such officer or agency must entertain and exercise its discretion in the manner prescribed by Congress. See United States ex rel. Kasparian v. Hughes, D.C.E.D.Pa. 1922, 278 F. 262; United States ex rel. Cavanaugh v. Howe, D.C.S.D.N.Y.1916, 235 F. 990.

Here, there are no issues of fact to be resolved, nor does it appear that the Attorney General in exercising his discretion as he did *relied* on evidence or factors that are not in the record before us. In this regard, we are fully aware, of course, that the Regional Commissioner, in making his determination, commented as follows:

"I have also considered all the reliable additional information made available to me through official government channels, pertinent to the proper disposition of this application."

This does not indicate to us that such additional information was *relied* on by the Regional Commissioner nor that it was the basis for his action. In Jay v. Boyd, 1956, 351 U.S. 345, 360, 76 S.Ct. 919, 928, 100 L.Ed. 1242, the Supreme Court, in approving the use of undisclosed information, said:

"We conclude that, although undisclosed information was used as a *basis* for denying suspension of de-

---

In the following cases it does not appear that any direct evidence was offered to show that the particular alien-applicant under subsection 243(h), 8 U.S.C.A. § 1253(h), would be "physically persecuted," and the only evidence offered from which that fact could be inferred was as follows:

Blazina v. Bouchard, 3 Cir., 1961, 286 F.2d 507, 511, (the court summarized the alien's fear as follows: "At worst, it appears that he will be 'looked down upon' and will encounter some 'complications.' ")

Petrovic v. Pilliod, 7 Cir., 1960, 282 F. 2d 877 (applicant was unwilling to serve in the Yugoslav Army and had denounced Communism during conversations with friends and acquaintances).

Obrenovic v. Pilliod, 7 Cir., 1960, 282 F.2d 874 (alien served with Chetniks during World War II, was arrested after that war, family tragedy suffered under Tito government, secured a passport surreptitiously, and authored an article on conditions in Yugoslavia).

Kam Ng v. Pilliod, 7 Cir., 1960, 279 F. 2d 207 (water shortage in Hong Kong would endanger alien's health because of existing kidney condition).

United States ex rel. Cantisani v. Holton, 7 Cir., 1957, 248 F.2d 737 (alien was attacked by a group of Communists in 1942 in an Italian village to which his deportation was ordered).

Batistic v. Pilliod, D.C.N.D.Ill.1960, 188 F.Supp. 344 (fear of possible military service in Yugoslav Army including duty at an isolated station).

In Sunjka v. Esperdy, D.C.S.D.N.Y. 1960, 182 F.Supp. 599, 601, the court said: "In sum, the evidence introduced by the plaintiffs establishes that they are practicing Roman Catholics and that they oppose Communism. This * * * does not permit the court to conclude that administrative discretion was abused. * * * "

portation, none of the above-mentioned regulations was transgressed." (Emphasis supplied.)

Shortly after the Jay decision was handed down, General Joseph M. Swing, Immigration Commissioner then, and apparently at the time the instant application was disposed of (United States Government Organization Manual 1960–1961, p. 206), was quoted as saying that undisclosed information would be used only when "the most compelling reasons involving the national safety or security are present." General Swing also indicated that only he, as Commissioner, and not his subordinates, could certify that such urgency existed. New York Times, Nov. 4, 1956, § 4E, p. 12, col. 2. It is clear here that all questions arising out of Dunat's application were disposed of by the special inquiry officer and the Regional Commissioner, who are the Immigration Commissioner's subordinates. Unless we are to assume that these subordinates acted in contravention of the Commissioner's directions, there is no basis for concluding that in disposing of Dunat's application they relied on information not in the record. In any event, it is abundantly clear from the record before us that the Regional Commissioner gave the statutory phrase "physical persecution" the same erroneous construction as did the special inquiry officer and which, as pointed out heretofore, constituted an *error of law.*

All that remains for us is to apply a legal standard enacted by Congress and interpreted by the courts to the uncontradicted facts before us. See O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483. It is our conclusion that an indefinite stay of deportation should be entered subject to changing circumstances, Dunat's deportation under other appropriate statutory provisions, and supervision over him by the Attorney General under subsection 242 (d) of the Immigration and Nationality Act, 8 U.S.C.A. § 1252(d).

1. United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 1954, 218 F.2d 316, 318; Chao-Ling Wang v. Pilliod,

The judgment and order of the district court will be reversed and the cause remanded to that court for entry of an order not inconsistent with this opinion.

FORMAN, Circuit Judge (dissenting).

Natural abhorrence for any governmental discrimination on account of race, religion or political opinion inclines one to concur with the majority. Adherence, however, to the well recognized doctrine that in the field of immigration and nationality, Congress has vested the executive branch of the Government with wide discretionary powers and that the scope of judicial review is closely circumscribed,[1] compels me to dissent.

The majority holds that the Attorney General through his Special Inquiry Officer erroneously interpreted the phrase "physical persecution" when the report of the latter was adopted, wherein he said, "The fact that the applicant might be denied employment for church membership or for failure to join the Communist Party is likewise not within the import of the term 'physical persecution'." The majority finds that the Attorney General thereby overlooked the economic reality that "(t)he denial of an opportunity to earn a livelihood in the country such as the one involved here is the equivalent of a sentence to death by means of slow starvation and none the less final because it is gradual."

The sentence quoted from the report of the Special Inquiry Officer, however, must be read in its context. The Officer was analyzing all of the testimony in the case in its reflection of the claimed physical persecution in three aspects. He said:

"An analysis of all the testimony in this case reflects that the claim of physical persecution has a three-fold aspect. First, the applicant fears loss of ability to obtain work and imprisonment because he jumped ship. Such a possible punishment is not

7 Cir., 1960, 285 F.2d 517; Blazina v. Bouchard, 3 Cir., 1961, 286 F.2d 507.

the physical persecution contemplated by the statute. Physical persecution contemplates incarceration or subjection to corporal punishment, torture, or death based usually on one's race, religion or political opinion. Conviction followed by imprisonment for crimes cognizable as such under generally recognized civilized juridical systems, is not physical persecution.

"Second, he alleges that he would be unable to obtain employment in Yugoslavia. As to this it might be stated that economic sanctions applied against those who are not members of the controlling clique in a country whose economic system is completely and rigidly state-controlled is not physical persecution. Therefore, there remains only for consideration the applicant's claim that he might be jailed because of the refusal of his family to join the Communist Party following requests upon him on board ship to do so. On the question of freedom of worship one item of evidence must not be overlooked and that is the testimony of the pastor who was a witness for the applicant that the Communists cannot stamp out the Catholic Church and that Catholics will and do find ways to worship even though they may be deprived of the ability to earn a living because of that.

"It would appear established from various sources that the government of Yugoslavia is dominated and controlled by the Communist Party of that country and that the economic and political philosophy of the country differs only in degree from that followed in the USSR and its satellite countries. Advancement in almost any line of activity is, with few exceptions, limited to Party members. The basic freedom to criticize, as we know and enjoy it, does not exist in Yugoslavia. On the other hand churches throughout the country are open for public worship and religious assembly and they are being maintained, obviously with government permission, if not with its approval and support. The applicant's family has not been physically persecuted, within the meaning of that term, merely because his wife and two sons go to church, even though it should be established that they are denied *certain types of employment*. The fact that the applicant might be denied employment for church membership or for failure to join the Communist Party is likewise not within the import of the term 'physical persecution'. The applicant claims he may be jailed for failure to join the Communist Party pursuant to requests to do so while on board ship. It is clear, however, that he has returned to Yugoslavia on occasions after refusing to join the Communist Party prior to his last refusal and he was not imprisoned for it. His present statement that he feels he would be persecuted at this time is unsupported. He was not jailed before but was free to continue his calling as a crewman.

"From all of the testimony, as discussed above, it is believed that the applicant has failed to establish that he would be physically persecuted, as that term is contemplated in Section 243(h) of the Immigration and Nationality Act, if he were to return to Yugoslavia." (Emphasis supplied.) Report and Recommendation of Special Inquiry Officer, August 12, 1958.

It should be noted that it is the Regional Commissioner to whom the Attorney General has delegated the power to withhold deportation under § 243(h), 8 U.S.C. A. § 1253(h).[2]

---

2. The pertinent administrative regulation reads in part:
 "(2) If the request for a stay of deportation is predicated upon a claim by the alien that he would be subject to physical persecution if deported to the country designated by the Service, he shall be requested, upon notice, to appear

The Regional Commissioner for the Southeast Region of the Immigration and Naturalization Service, in making his determination to deny appellant's application, commented as follows:

"On October 31, 1956, pending receipt of official information which could assist in resolving the issues presented in such cases as this, other Yugoslav nationals in similar circumstances were granted a stay of deportation until January 1, 1958.[3]

"I have carefully reviewed the transcript of the interrogation of the applicant, the evidence he has submitted for consideration, the findings and recommendations in the matter of the Special Inquiry Officer; and the representations made by the applicant's counsel.

"*I have also considered all the reliable additional information made available to me through official government channels, pertinent to the proper disposition of this application.*

"Upon consideration of all the pertinent information at hand, there are, in my opinion, insufficient grounds to support a finding that the applicant would be subject to physical persecution if deported to Yugoslavia; therefore, his deportation should not be withheld under Section 243(h) of the Immigration and Nationality Act." (Emphasis supplied.) Order Denying Applica-

tion under § 243(h) of August 20, 1958.

Subsequently the proceedings were reopened at the request of the appellant for the introduction of additional testimony before the same Special Inquiry Officer. He reported upon the additional evidence and reiterated his recommendation that the application should be denied. The report and recommendation came before a successor Regional Commissioner who denied the application in the following language:

"An interrogation on the application for withholding of deportation was conducted at Philadelphia, Penna., on August 11, 1958. The Special Inquiry Officer who conducted the interrogation recommended that the application be denied. The Regional Commissioner concurred in this recommendation, and on August 20, 1958 ordered that the application for withholding of deportation be denied. .

"Upon motion of Counsel the interrogation was ordered reopened by the Regional Commissioner on November 19, 1959 to permit the introduction of additional evidence. The reopened interrogation was conducted in Philadelphia, Penna., on January 5, 1960. The Special Inquiry Officer who conducted the reopened interrogation has recommended that the application be denied.

before a special inquiry officer for interrogation under oath. The alien may have present with him, at his own expense, during the interrogation any attorney or representative authorized to practice before the Service. The alien may submit any evidence in support of his claim which he believes should be considered by the special inquiry officer. Upon completion of the interrogation, the special inquiry officer shall prepare a written memorandum of his findings and a recommendation which shall be forwarded to the regional commissioner, together with all the evidence and information submitted by the alien or which may be applicable to the case."

&ast; &ast; &ast; &ast; &ast;

"The decision whether to withhold deportation and, if so, for what period of time shall be finally made by the regional commissioner upon consideration of all the evidence submitted by the alien and any other pertinent evidence or available information." 8 C.F.R. 243.3(b) (2); Chao-Ling Wang v. Pilliod, 7 Cir., 1960, 285 F.2d 517.

3. See The Matter of Kale, A9 555 532, decided by the Assistant Commissioner of the Enforcement Division of the Immigration and Naturalization Service, April 23, 1958, referred to in Dombrovskis et al. v. Esperdy, D.C.S.D.N.Y.1961, 195 F.Supp. 488 and Batistic v. Pilliod, D.C.N.D.Ill.1960, 188 F.Supp. 344, affirmed 7 Cir., 1961, 286 F.2d 268.

"The additional evidence which was submitted at the reopened interrogation has been adequately discussed in the recommendation of the Special Inquiry Officer, and has been carefully reviewed and considered. It is my opinion that the applicant has failed to establish that he would be subject to physical persecution if he returned to Yugoslavia.

"The findings and the recommendations of the Special Inquiry Officer will be approved, and stay of deportation will be denied." Order denying stay of deportation of February 26, 1960.

The majority ignores the findings of the Regional Commissioner as a whole and places too heavy an emphasis upon the single sentence in the report of the Special Inquiry Officer—"The fact that the applicant might be denied employment for church membership or for failure to join the Communist Party is likewise not within the import of the term 'physical persecution'. " Particularly that sentence must be read with the one preceding it—"The applicant's family has not been physically persecuted, within the meaning of that term, merely because his wife and two sons go to church, even though it should be established that

they are denied *certain types of employment.*" (Emphasis supplied.) When so read the words "might be denied employment" in the offending sentence are similarly restricted to "certain types of employment".

It is true that the evidence offered by appellant to the Special Inquiry Officer was to the effect that economic sanctions were leveled at those who adhered to the Catholic faith and declined membership in the Communist Party by precluding them from holding government jobs. Granted that most employment in Yugoslavia is governmentally controlled there is nothing in the evidence to support the conclusion that Catholics and political dissenters were precluded from *all* forms of employment and that it must necessarily follow that they slowly starve to death. Of course if this were so it would indeed constitute "physical persecution". But apparently the Attorney General was not so persuaded from the evidence offered by the appellant as he weighed it against the information that was available to him.[4]

Only in the Attorney General did Congress vest the power under § 243(h) of the Immigration and Nationality Act to stay a valid order of deportation when in *his* opinion that deportation would sub-

4. In United States ex. rel. Dolenz v. Shaughnessy, 2 Cir., 1953, 206 F.2d 392, 394–395, the court said:

"That section modifies the language of the former statute in a manner which shows clearly, we think, that the withholding of deportation in cases where the alien fears persecution rests wholly in the administrative judgment and 'opinion' of the Attorney General or his delegate. The courts may not substitute their judgment for his. Doubtless a court might intervene to stay deportation, if the Attorney General or his delegate should deny the alien any opportunity to present evidence on the subject of persecution or should refuse to consider the evidence presented by the alien. *But we see nothing in the statute to suggest that the courts may insist that the Attorney General's opinion be based solely on evidence which is disclosed to the alien. In his official capacity the Attorney General has access to confidential information derived*

*from the State Department or other intelligence services of the Government which may be of great assistance to him in making his decision as to the likelihood of physical persecution of the alien in the country to which he is to be deported. We believe Congress intended the Attorney General to use whatever information he has.* To preclude his use of confidential information unless he is willing to disclose it to the alien would defeat this purpose. Moreover, the very nature of the decision he must make concerning what the foreign country is likely to do is a political issue into which the courts should not intrude. As was said in Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568: 'But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial.'" (Emphasis supplied.)

ject an alien to physical persecution. That power was substantially broadened in the 1952 Immigration and Nationality Act.[5] Here, ample, even generous, opportunity was granted appellant to place his application for stay before the Attorney General and it was given consideration in accordance with the statute and the regulation thereunder. Procedural due process and a fair consideration of his application was accorded to him, for the lack of which, only, is court intervention permissible.

In proceedings involving applications for suspension of deportation under § 244(a) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1254(a), certainly more formal and prescribed, than those now under review, it has been held that the Attorney General's power to grant or deny suspension is a dispensing power, a matter of grace not right, comparable to the power of a judge to suspend the execution of a sentence or the President to pardon a convict.[6]

I cannot agree with the majority that the failure to grant the stay of deportation was arbitrary and capricious in view of the evidence presented by the appellant, the information available to the Attorney General and the discretion vested in him by Congress. On the contrary I am convinced that he acted well within the power vested in him and that a

reversal of his decision substitutes the judgment of the court for his opinion.

I would affirm the judgment and order of the district court.

### On Reargument.

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges.

### PER CURIAM.

Four members of the court agree fully with the views expressed by the majority of the panel which first heard this case; four do not. However, all of us agree, contrary to what seems to have been the position of the Attorney General during administrative consideration of this case, that economic proscription so severe as to deprive a person of all means of earning a livelihood may amount to physical persecution. On reargument this position was conceded by the government.

In the circumstances we all agree that the judgment of the district court must be reversed, deportation stayed, and the cause remanded to the Attorney General. However, the Attorney General will be free, as indicated in the opinion on first argument, to reopen the case for further consideration based upon additional evidence and information not heretofore considered.

It will be so ordered.

---

5. This is made clear in United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 1954, 218 F.2d 316, 318, where the court stated:

" * * * In particular, we have held that under § 243(h) the question of whether deportation should be withheld because an alien fears persecution rests solely with the Attorney General or his delegate. United States ex rel. Dolenz v. Shaughnessy, 2 Cir., 1953, 206 F.2d 392. We there pointed out that whereas the comparable section in the predecessor statute, § 23, Internal Security Act of 1950, 64 Stat. 1010, required withholding the deportation of any alien to any country in which the Attorney General 'shall find' that such alien would be subjected to physical persecution,

present § 243(h) modified that provision so as simply to authorize the Attorney General to withhold deportation to any country in which 'in his opinion' the alien would be subjected to such persecution. We found in this change of language a clear indication that Congress intended the withholding of deportation in such circumstances to rest 'wholly in the administrative judgment and "opinion" of the Attorney General or his delegate.' United States ex rel. Dolenz v. Shaughnessy, supra, 206 F.2d at page 394 * * *"

6. Jay v. Boyd, 1956, 351 U.S. 345, 354, 76 S.Ct. 919, 100 L.Ed. 1242; United States ex rel. Kaloudis v. Shaughnessy, 2 Cir., 1950, 180 F.2d 489, 491.