## MATTER OF VARDJAN

### In DEPORTATION Proceedings

### A-11076903

### *Decided by Board June 3, 1964*

(1) Reopening of application under section 243(h), Immigration and Nationality Act, for submission of interrogatories to a Yugoslav consular officer will be denied because respondent has failed to meet the burden of establishing the necessity for the interrogatories or that the evidence is readily available since there is no showing of person before whom the interrogatories would be taken, that witness would voluntarily present himself to answer the interrogatories or authority exists in Yugoslavia to compel testimony, and there is no suggestion that letters rogatory are feasible or desirable.

(2) Respondent's request for examination of Government report containing background information on conditions in Yugoslavia should have been denied on a claim of privilege as provided in 8 CFR 242.17(c).

(3) Respondent has not established that because of her anti-Communist sentiments her efforts to resist return to Yugoslavia would subject her to physical persecution within the meaning of section 243(h) of the Act, if deported to that country.

(4) While respondent's economic prospects in Yugoslavia may not be good in view of her age (60), limited skills, anti-Communist sentiments, and reluctance to return to that country, subsistence at a low level does not establish physical persecution within section 243(h) of the Act even if such subsistence, in whole or in part, results from restrictions on employment opportunities imposed deliberately because of her race, religion, or political opinion; only total proscription of employment for such reasons suffices.

(5) Section 243(h) does not contemplate protection against any future vagaries in the political scene under which the likelihood of physical persecution may be greater than at the present time, since such future possibilities are not amenable to proof; only where the likelihood of physical persecution presently exists is withholding of deportation warranted.

CHARGE:

Warrant: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Remained longer—Nonimmigrant visitor for pleasure.

Respondent applied for withholding of her deportation to Yugoslavia on the ground that she would be physically persecuted there. She appeals from the special inquiry officer's denial of that application.

In our opinion respondent would not be subject to physical persecution in Yugoslavia. Therefore we concur in the special inquiry officer's action.

Respondent's authority to remain in this country as a visitor for pleasure expired on June 8, 1959. She had entered at New York on June 17, 1957. Deportation proceedings commenced on November 20, 1959, with service of the order to show cause. Initially the special inquiry officer granted respondent voluntary departure with an alternate order of deportation. A private bill in respondent's behalf was then pending in Congress. Respondent did not appeal from the special inquiry officer's decision.

Congress acted adversely on the private bill. Accordingly the Service, on June 29, 1960, notified respondent that she had until August 3, 1960, to depart voluntarily from the United States. On August 2, 1960, respondent, pursuant to section 243(h) of the Immigration and Nationality Act, filed her application for withholding of her deportation to Yugoslavia, apparently anticipating that the Service would direct her deportation to that country.[1]

The Service attempted to accord respondent a hearing upon her application before a special inquiry officer under the regulations then in effect. Respondent's counsel objected to her examination by anyone except a hearing officer appointed pursuant to the provisions of the Administrative Procedure Act. On advice of counsel, respondent declined interrogation and offered no evidence. The special inquiry officer recommended denial of the application. The regional commissioner on January 17, 1961, entered an order of denial.

Respondent sought support for her position in the United States District Court for the Southern District of New York. The court, however, ruled adversely to respondent. On June 4, 1962, the Court of Appeals affirmed that judgment, per curiam, on the lower court's opinion.

After the regional commissioner denied respondent's section 243(h) application, the Service tried to obtain a Yugoslav travel document for respondent. Respondent declined to appear at the Yugoslav consulate for a personal interview requested by a consular officer. At the Service's request, however, respondent appeared with her counsel at the Service's local office. A Yugoslav consular officer also appeared. No prior arrangement had been made with respondent for interview by, or in the presence of, a Yugoslav official.

---

[1] Section 243(h) provides as follows:

The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason.

Respondent says that the immigration officer, at the request of the Yugoslav official, inquired why respondent had declined to appear at the consulate voluntarily to renew her passport. Respondent, on advice of counsel, declined to answer. Her attorney relates that prior to that question he had strenuously objected to the procedure and that, after respondent declined to answer the one and only question put to her, a further heated exchange followed. The immigration officer then terminated the interview.

In July of 1962—subsequent to the Court of Appeals' decision affirming dismissal of respondent's complaint—respondent moved to reopen the administrative proceedings. The Service at first opposed that motion but later withdrew its objections. The special inquiry officer granted respondent's motion. After full hearing on the merits, the special inquiry officer denied the application, entering the order under review here.[2]

At the reopened hearing respondent renewed her objections to the special inquiry officer's legal competency to preside. Her counsel indicated that he again raised this point, which the courts had decided against respondent, merely to preserve any rights or benefits respondent might obtain in the event the Supreme Court in another matter involving this issue rules to the contrary. Counsel has not pressed this point on appeal. Therefore, we need not consider the effect of the Court of Appeals' judgment in relation to these proceedings, nor the correctness of the special inquiry officer's ruling that respondent's renewal of the objection was frivolous.

Respondent requests that, if we are unable to rule favorably upon her application on the record before us, we remand the case to the special inquiry officer for submission of interrogatories to the Yugoslav consular officer who attempted to interview respondent in connection with her passport application and for production by the Service of certain reports in its possession covering general conditions in Yugoslavia. Although we believe we could dispose of this case without reaching the procedural points raised by respondent, we shall discuss them because of their importance for other proceedings.

### I. Respondent's request for submission of interrogatories to a Yugoslav government official

Respondent has prepared written interrogatories directed to the Yugoslav consular officer who was present at her interview at the Service's New York office. The record shows that officer's address in Belgrade. The interrogatories are not part of the record but were

---

[2] Between administrative hearings, the regulations had changed to give jurisdiction in 243(h) proceedings to the special inquiry officer, and, on appeal, to us.

marked for identification (Ex. R-3). We shall not, therefore, refer to their specific contents but only to such matters as are developed in the record. The record sufficiently reflects their purpose, however.

The special inquiry officer refused to authorize presentation of the interrogatories to the Yugoslav official. He said that, because it is doubtful whether the official would or could be requested to answer, the proposed testimony could not be considered readily available. He also said the interrogatories are exploratory and of doubtful materiality here. We agree with the special inquiry officer's action, but the denial may better be based on other grounds.

Respondent has the burden of showing the necessity of taking the deposition of a prospective witness.[3] Respondent's counsel said that through the interrogatories he seeks to establish that the interview at the Service office brought to the Yugoslav authorities' attention that respondent seeks political refuge in this country, that she is not in sympathy with the regime in Yugoslavia, that she fears the government there, and that, out of fear, she refused to appear at the Yugoslav consulate to answer the consular officer's questions. Even assuming that the occurrences at the Service office were reported to the home authorities and tended to create the impression respondent seeks to establish, the proposed interrogatories are not necessary as evidence of the probable attitude of the Yugoslav authorities toward respondent in the event of her deportation to Yugoslavia. We may concede on the basis of the evidence of record that that attitude is apt to be hostile.

It is possible the Yugoslav authorities are not aware of the judicial proceedings in respondent's behalf, although we consider such unawareness doubtful. Yet, apart from the judicial proceedings and the interview in question, the record shows respondent's long absence from Yugoslavia, her one brief contact with the consulate in 1958 for renewal of her passport, her failure in 1961 to respond to the consulate's invitation for an interview, and the consulate's awareness that respondent is under deportation proceedings here. It is obvious on these facts alone, therefore, the Yugoslav authorities are aware respondent is resisting returning to that country. Without events at the Service's office, they might not now be as aware of respondent's reasons for refusing to contact the consulate—assuming those events were reported to them. If respondent were returned to the jurisdiction of those authorities, however, they could by interrogation and investigation easily ascertain her reasons for resistance.

Thus, even if the Yugoslav consular officer responded to the interrogatories, and respondent's expectations were met, the evidence, for

---

[3] *U.S.* v. *Ausmeier*, 5 F.R.D. 395 (E.D. N.Y., 1946).

our purposes, would be largely cumulative. Such evidence might at best serve to bring into sharper focus respondent's relationship with the Yugoslav authorities. Any corroborative value it might have for other evidence of record, would be slight, however. Moreover, for reasons which we shall develop later, we do not believe that the events involving the consular officer unduly prejudiced respondent with the Yugoslav authorities insofar as likelihood of physical persecution is concerned.

Thus respondent has failed to discharge her burden of showing the necessity for the interrogatories. For that reason alone they should not be authorized. Because the situation is somewhat unusual and our reasons for denying respondent's request may be important in other proceedings, however, we shall refer to various additional justifications for denial.

As the special inquiry officer has pointed out, the regulations for proceedings under section 243(h) of the Immigration and Nationality Act authorize respondent to submit such evidence as is readily available.[4] In requesting presentation of interrogatories to the prospective witness, the burden is upon respondent to show the witness will present himself voluntarily to answer the interrogatories, or, if not, an authority in Yugoslavia to compel testimony.[5] Respondent also should show the person before whom the interrogatories would be taken. She has done none of these. Although her counsel, in supporting the request, mentioned that permission to take interrogatories have been addressed to consuls in various parts of the world, he suggested no procedure for the interrogatories here. The Federal Rules of Civil Procedure provide a method for taking depositions in a foreign country which we might adopt.[6] Our consular officers qualify as persons before whom such depositions may be taken.

Respondent has not shown, however, that the Yugoslav government permits our consular officers to take depositions—particularly when the prospective witness is not only a Yugoslav national but a govern-

---

[4] 8 CFR 242.17(c).

[5] Cf. *U.S. v. Ausmeier, supra*[3].

[6] Rule 28(b) provides:

In a foreign country, depositions may be taken (1) on notice before a person authorized to administer oaths in the place in which the examination is held, either by the law thereof or by the law of the United States, or (2) before a person commissioned by the court, and a person so commissioned shall have the power by virtue of his commission to administer any necessary oath and take testimony, or (3) pursuant to a letter rogatory. A commission or a letter rogatory shall be issued on application and notice and on terms that are just and appropriate. It is not requisite to the issuance of a commission or a letter rogatory that the taking of the deposition in any other manner is impracticable or inconvenient * * *.

ment official—or whether any consular convention between this country and Yugoslavia covers such a situation.[7]

Moreover, in *Branyan v. Koninklijke Luchtvaart Maatschappij* the Department of State acknowledged that letters rogatory rather than notice to a consular officer or a commission provide the only feasible means of obtaining the testimony of government employees and the production of official records.[8] Although the information sought in *Branyan* was voluminous, technical, and complex—involving investigation of an airplane crash—the principle appears equally applicable here. Consular officers would naturally be reluctant to take testimony from officials of the host country, particularly in a matter which might be sensitive to the host government. Respondent does not even suggest that letters rogatory are feasible or desirable here.

Finally, respondent seeks to obtain what would in effect be admissions against interest by a Yugoslav official. If that official were willing to make any statement at all (and assuming that a suitable method for taking the statement could be found) the possibility of obtaining probative evidence favorable to respondent's cause is remote.[9]

## II. Respondent's request to examine certain reports contained in the Service's records

Respondent refers to administrative proceedings before the Service in the case of a certain Yugoslav national. Those proceedings have been cited in judicial decisions.[10] In reaching its decision in that case, the Service relied upon certain reports obtained through various official sources. Those reports contained background information on conditions in Yugoslavia. Respondent requests that the reports be made available for her examination.

The special inquiry officer denied this request on the ground that there is no showing that the information is sufficiently current and relevant to the particular facts and circumstances here to justify its production, and on the further ground that respondent's request appears to be a fishing expedition. The special inquiry officer also mentioned—apparently as an additional reason for not directing production of the report—that some of the information may be confidential. He did not, however, specifically assign any claim of privilege

[7] See generally 22 U.S.C. 841, 846, 1195, 1203.

[8] 13 F.R.D. 425 (S.D. N.Y., 1953).

[9] Compare *Sang Ryup Park v. Barber*, 107 F. Supp. 605 (N.D. Calif., 1952)—a somewhat analogous situation in reverse. There the Service sought evidence of nonpersecution from an interested foreign official.

[10] *Matter of Kale*, A-9555532, April 23, 1958, discussed at length in *Dombrovskis v. Esperdy*, 195 F. Supp. 488 (1961).

to the documents. The trial attorney objected to production of the reports but did not specifically raise any claim of privilege.

Although we believe the special inquiry officer's denial of this request should have been based upon an assertion that the information is privileged under the regulations, we shall not disturb his ruling.[11] We are familiar with the information which respondent seeks to examine. In our opinion, the regulations protect it from disclosure.

We also believe the information would not materially assist respondent's case. The burden upon respondent is heavy, however. Evidence having a direct bearing upon an application for section 243(h) relief is difficult to obtain. In proceedings under section 243(h), therefore, we would be inclined to be liberal in determining the reasonableness and propriety of a request to examine information in the possession of the Government, if that information were nonprivileged.

### III. Background for respondent's application under section 243(h)

Respondent is a national of Yugoslavia of German extraction. Her birthplace was formerly in Austria. Now, however, it is in Yugoslavia. Respondent is 60 years old, married but separated.

Respondent completed eight years of elementary schooling in her homeland. She lived in this country from 1920 to 1926. She then returned to Yugoslavia where she married that same year. She and her husband separated in 1951. In Yugoslavia respondent worked on land belonging to herself or her family and did housework. She has worked as a housekeeper in this country.

Respondent's husband lives in Yugoslavia. She has a son and two daughters. One daughter lives in Yugoslavia. The son and other daughter live in Germany. In this country respondent has two sisters and a brother.

Respondent testified that she and members of her family favored reestablishment of the Royal Government after World War II. She says they were known to be opposed to communism. Apparently she and her family were relatively large landholders.

In 1942 respondent's husband was arrested by the partisans and almost shot, but he escaped. He spent most of the war in Italian and German camps. Respondent's sister and brother-in-law were also sentenced to death by the partisans, but escaped. One of respondent's daughters, who was told the partisans planned to kill her, had to flee to Italy.

---

[11] 8 CFR 242.17(c) provides in part:

The determination under section 243(h) of the Act may be based upon information not of record if, in the opinion of the special inquiry officer or the Board, the disclosure of such information would be prejudicial to the interests of the United States.

Respondent's mother left Yugoslavia in 1955 and went to Austria, where she died about a year later. Upon her death the Yugoslav government confiscated her property. About 1950 respondent had also lost a large piece of land and a house. She owned this property with her husband. Respondent's testimony is not too clear, but it appears the government took for some special purpose considerable property where her land was located. Respondent received no compensation for her or her mother's land but her husband received a piece of property in exchange for his half of the property which he and respondent owned.

## IV. Respondent's reasons for anticipating physical persecution in Yugoslavia

Respondent's contention that she will be physically persecuted in Yugoslavia rests generally upon her testimony that she and her family are known as anti-Communists and that she would now be in even greater disfavor with the Yugoslav authorities because of her unauthorized absence from that country and her refusal to return. She points to the Communists harassment of herself and members of her family through threats of, or attempts at, violence and by confiscation of her property and her mother's property without compensation. Respondent also believes that, because she has lost her farm land, she would be unable to support herself in Yugoslavia. She says no individual in Yugoslavia would employ her because there is no private work and the government would not want her.

Respondent's testimony, at best, shows that she encountered socioeconomic difficulties in Yugoslavia because she was known not to be sympathetic toward the Communist regime. She never suffered any actual physical persecution. We do not believe her position would be appreciably worse if she were to return there.

The threats of bodily harm and attempts at physical violence which respondent says were directed against members of her family, occurred during the war. Partisans made them. Respondent testified vaguely concerning the reasons for the partisans' actions. Her testimony suggests certain possibilities, however. The partisans may have considered respondent's family either was not supporting them sufficiently or represented actual opposition. Respondent indicates she and her family favored King Peter. The partisans may also have been opposed to respondent's family because of their ethnic origin, or their holdings of land. In any event, the wartime occurrences do not indicate any active opposition to communism which might now be apt to lead to hostile treatment of respondent at the hands of the Yugoslav authorities. Moreover, the past actions of those authorities in confiscating land belonging to respondent and her mother would also be unlikely to

cause independently any new reprisals against respondent or to aggravate seriously any harsh treatment arising from other causes.

Respondent's testimony giving the reasons underlying the taking of her land is also vague. Apparently the government wanted at least part of it for some specific public purpose. Respondent believes she was not compensated because of her anti-Communist record, but such loss, even though severe economically, did not amount to physical persecution.

Respondent's age and limited skills would doubtless restrict her employment opportunities in Yugoslavia. The authorities there might intentionally further restrict respondent's employment opportunities because of the matters to which she has testified, including her attempts to avoid returning to her homeland. We doubt, however, that respondent's fears that in Yugoslavia she would be totally without any means of support would be realized. Her economic prospects would not be good, but subsistence at a low level does not meet the statutory standard for physical persecution, even if such subsistence, in whole or in part, results from restrictions on employment opportunities imposed deliberately because of the individual's race, religion, or political opinion. Only total proscription of employment for such reasons suffices.[12] Respondent has not offered any evidence to corroborate her statement that the authorities would not want her because they know she is against them and would not care for her—how she lives, and what she does, or if she dies.

Respondent says that if deported to Yugoslavia, she would be taken into custody, given a hearing, put in prison and maybe beaten up. She says she will have no freedom in Yugoslavia.

We believe respondent would probably be questioned by the Yugoslav authorities if she were returned to her homeland. Possibly she would be confined during such examination. We believe any such confinement would be relatively brief, however. We see nothing in the record which indicates any likelihood of a prolonged investigation. Contrary to respondent's expectations, we also see little or no likelihood respondent would be imprisoned as a result of investigation. If by any chance respondent were imprisoned, we believe confinement would be for a relatively brief period of time. There are no circumstances in this record which indicate otherwise. Certainly, no reason appears for believing that respondent would be subject to imprisonment so prolonged or under such severe conditions as to constitute physical persecution.

---

[12] *Dunat* v. *Hurney*, 297 F. 2d 744 (C.A. 3, 1962). Cf. *Soric* v. *Flagg*, 303 F. 2d 289 (C.A. 7, 1962).

Current evidence of respondent's attitude toward the Yugoslav authorities is reflected primarily in her reluctance to return to her country. The record, however, contains nothing to distinguish her case from the numerous cases of Yugoslav nationals who have attempted strenuously to remain in this country rather than return to Yugoslavia. Respondent says that the incident which occurred in the presence of the Yugoslav consul at the Service office is the worst thing that could happen to her in her relations with the Yugoslav authorities. She based her motion to reopen these proceedings upon that incident. We believe she has exaggerated its importance. The most favorable inference in her behalf that we can draw is some emphasis of her reluctance to be interviewed by a Yugoslav consular officer and to participate in any steps designed to enable this country to return her to Yugoslavia. The consulate, of course, was aware of such reluctance. The attempted interview proposed to overcome it.

Yugoslav authorities may pay some special attention to respondent's role at the attempted interview, if respondent is returned to Yugoslavia and subjected to interrogation or investigation. Respondent, therefore, has cause to be concerned. We do not believe she need anticipate actual physical persecution, however. We doubt that the Yugoslav authorities would take such a severe view of the matter. Thus the incident is by no means dispositive of the issue here.

We believe respondent while testifying had in mind primarily the harsh conditions in her homeland immediately following World War II. Political restrictive measures against individuals have relaxed considerably in Yugoslavia, even since respondent left there in 1957. In the light of such current conditions as we may officially notice, and on the basis of respondent's own circumstances as shown in the record, we perceive no valid grounds for anticipating respondent would be physically persecuted if deported to Yugoslavia. Considering respondent's case as a whole, the Yugoslav authorities are at most likely to subject respondent to some form of social and economic sanctions. Respondent's individual freedom may even be severely limited in numerous ways short of actual incarceration. Section 243(h) does not protect against such sanctions and restrictions, however.

Respondent has submitted several pieces of documentary evidence in the form of a book, reports, congressional correspondence, articles from a magazine and a Croatian newspaper, and newspaper clippings. This evidence bears upon conditions in Yugoslavia. Some of this material traces events during World War II, the transition to Communist control, and conditions in Yugoslavia in the period immediately following World War II. Other material is more current. The most recent information of any substance covers events approximately through 1961.

This material serves mainly two purposes. It provides background information on living conditions in Yugoslavia under the Communist regime which respondent would face if she were returned to that country.[13] We would, in any event, take official notice of much of this information, but the material is helpful in calling our attention, and the attention of the special inquiry officer, to such matters. More importantly, the information serves as the basis for an argument which would substantially enlarge the scope of section 243(h). Counsel attempts to relate to respondent's particular situation general statements found throughout some of the material which describe difficulties of life in Yugoslavia. These difficulties confront practically all persons who do not accept communist principles.

As we have seen, however, within our conception of the scope of section 243(h) there is no reason to believe respondent would be subject to physical persecution if returned to Yugoslavia. We could grant her application, therefore, only if we interpreted section 243(h) to include the case of almost any person who has escaped from Yugoslavia or who, like respondent, has left legally but remained abroad because of reluctance to return to a Communist regime. In other words, we would have to so interpret section 243(h) that flight from Yugoslavia per se renders a returnee subject to physical persecution.[14]

We are unwilling to so rule without a clear congressional expression that physical persecution within the meaning of the statute is that broad. Otherwise, such an interpretation would appear to run counter to the legislative policy for refugees as expressed through P.L. 86-648.[15] That policy limits recognition of the status of "refugee-escapee" even though the critical words in the definition of that term—"persecution or fear of persecution on account of race, religion or political opinion"—are, we believe, susceptible of a broader interpretation than the term "physical persecution" in section 243(h).[16] Clearly section 243 (h) of the Act is to be applied selectively.

Among the material submitted by respondent, and accepted by the special inquiry officer to the extent of particular passages selected by respondent, is Milovan Djilas' book, *The New Class* (Ex. R-7). One

---

[13] Included also is information on the plight of refugees from Yugoslavia.

[14] We believe the dispute between the special inquiry officer and respondent over the incident at the Service office as a "bootstrap operation" involves essentially the special inquiry officer's reluctance to rule that respondent's section 243(h) application and the incident before the consular officer per se justify withholding of her deportation. The effect of such factors should not be disregarded, but neither is in and of itself conclusive.

[15] 74 Stat. 504, as amended 76 Stat. 124. The amendment removed the original expiration date of July 1, 1962.

[16] The definition of "refugee-escapee" in section 15 of P.L. 85-316, 71 Stat. 643, was adopted by P.L. 86-648.

of those passages itself refutes part of respondent's argument. In speaking of discrimination practiced by a Communist dictatorship, Djilas says:

Persecution of democratic and socialist thought which is at variance with that of the ruling oligarchy is fiercer and more complete than persecution of the most reactionary followers of the former regime. This is understandable: the last named are less dangerous since they look to a past which has little likelihood of returning and reconquering.[37]

By her own testimony respondent favors the old regime. It is extremely doubtful, however, that even a Communist court would classify her as a highly reactionary follower of that regime. Moreover, despite respondent's experience in living outside of Yugoslavia, it is, if anything, more doubtful that she would become in Yugoslavia such an articulate spokesman for Western ideas and ideals as to become subject to physical persecution. Nothing in the supporting material submitted by respondent alters our opinion that respondent faces only the difficulties ordinarily experienced by returnees to Yugoslavia.

Respondent's testimony indicates that she expects long and harsh imprisonment, beatings, and possibly even death. The report on the European refugee situation prepared in 1959 by the Zellerbach Commission, which respondent submitted in evidence, describes the usual fate awaiting Yugoslav returnees. The commission's interviews with numerous refugees indicate the possibility of imprisonment at hard labor for a few months is not uncommon. More important, however, the returnee will almost certainly be out of favor with the regime. Such lack of favor will probably find practical expression in discrimination in such things as employment and housing and perhaps even a greater curtailment of individual freedom than the populace as a whole experiences.

The extent of such difficulties will, of course, vary greatly in the individual case. There are many variables. Among these variables are the individual characteristics of the returnee, the individual characteristics of the local Communist officials with whom the returnee comes into most intimate contact, and the overall political atmosphere at the time any particular hardship or difficulty is imposed. Among these factors we can here consider only respondent's individual characteristics and the current conditions and political atmosphere in Yugoslavia—to the extent that we may officially notice such conditions and atmosphere.

Respondent argues that section 243(h) contemplates as well protection against any future vagaries in the political scene under which the likelihood of physical persecution may be greater than at the

[37] At 144, 45.

578

present time. We do not agree. Such future possibilities are not amenable to proof and consequently their determination is not amenable to the adjudicative process. Only where the likelihood of physical persecution presently exists in a particular situation is withholding of deportation warranted. We do not find such likelihood here.

**ORDER:** It is ordered that the appeal be and hereby is dismissed.