**Zhen Hua LI, Petitioner**

v.

**ATTORNEY GENERAL OF THE UNITED STATES; \* Immigration & Naturalization Service, Respondents.**

No. 03–1930.

United States Court of Appeals, Third Circuit.

Argued Oct. 4, 2004.

Filed March 10, 2005.

---

\* Caption amended pursuant to Rule 43(c), F.R.A.P.

Steven J. Kolleeny, James R. Emerson (Argued), New York, NY, for Petitioner.

Donald E. Keener, Alison R. Drucker, Sarah Maloney (Argued), Christopher C. Fuller, Douglas E. Ginsburg, Lyle D. Jentzer, United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before SLOVITER, BECKER, and STAPLETON, Circuit Judges.

BECKER, Circuit Judge.

Zhen Hua Li, who contends that he has been persecuted as a result of his defiance of China's population control policy, petitions for review of an order of the Board of Immigration Appeals (BIA) affirming the denial of his application for asylum and withholding of removal. Although Li submits that he and his wife were threatened with sterilization, detention, and physical abuse, the evidence supporting the claim of physical persecution does not carry the day. His more significant claim is one of economic persecution: he and his wife were subjected to a fine equivalent to twenty months' salary, lost their jobs (and accompanying health insurance, food rations, and school payments), were effectively blacklisted from other government employment, and had their furniture and major household appliances confiscated. All of this, they argue, was deliberate retaliation for having had four children.

The BIA assumed that Li was credible, but found that he nevertheless failed to establish a claim of past economic persecution. While the contours of the doctrine are still developing, the existing jurisprudence establishes that economic deprivation, if sufficiently severe, can constitute persecution within the meaning of asylum law. Drawing upon that jurisprudence, we hold that deliberate imposition of severe economic disadvantage because of a protected ground may rise to the level of persecution. While the issue is close, we believe that on the evidence in the record, this rigorous standard was met here. Moreover, our examination of the record reveals that, given the BIA's credibility assumption, the Board understated the evidence in the record regarding economic persecution. For these reasons, we will grant Li's petition for review and remand to the BIA for further proceedings on the credibility issue.

## I. FACTS AND PROCEDURAL HISTORY

Li is a citizen of the People's Republic of China. He married in 1983. He was employed as a mechanic in government-owned factories since 1970, and his wife was employed as a nurse. Their first child was born in 1984, a second child in 1986, and a third in 1987. Apparently, at the time of his second child's birth, China allowed couples to have two children. However, according to Li, after the birth of the third child, the birth control officials punished him with a 1200 yuan fine, forced his wife to have an IUD implanted, and spared her sterilization only because she professed poor health. Li testified that the fine was equivalent to twenty months' salary. He submitted a receipt for 1200 yuan that indicated the fine was imposed for "violation of Planned Family policy."

Two years later, in 1989, Li's wife became pregnant with the couple's fourth child. At this point, more serious consequences ensued. First, the birth control officials notified the couple that Li's wife would have to have an abortion. In addition, Li claimed that he knew of someone at a neighboring factory who, after having a fourth child, was detained and beaten, suffering severe injuries to his legs, and was fired from his job, and that officials threatened that if Li's wife did not have an abortion, Li and his wife would "end up like them, we'll be captured and will be beaten up." Nevertheless, Li said that because his wife claimed that she had health problems, the doctors did not force her to have an abortion or to undergo sterilization after the baby was born. Li also expressed fear that the authorities might try to sterilize him if he were captured.

Before the baby was born, Li went into hiding in neighboring cities, but he returned home shortly after his wife gave birth to the fourth child. Upon arriving home, he found that he had been terminated from his job because of his violations of the population control policy. He introduced an unauthenticated document that stated the termination was for "serious violation of the planned family policy, as well as his forceful [sic] giving birth to the forth child."

After receiving notice of his termination, Li remained in hiding, staying with friends in other cities. Li admitted that he got by with "some temporary jobs" but claimed that "[b]ecause I have violated the birth control policy, most government companies would not hire me." Li stated that he was afraid to even apply for another job because "if I apply for jobs in ... government companies they will, my original factory ... would know my whereabouts so they ... would capture me." Thus, Li claimed that it was impossible to find a job because of his violation of the birth control policy.

With the loss of his job also came the loss of many other benefits, including health insurance, money for school tuition, and food rations. His wife was also fired from her job as a result of the fourth child and has been unable to obtain employment since. Moreover, Li testified that when he returned home on one occasion to visit his wife and children, the birth control authorities had confiscated appliances and large household items such as their refrigerator, television, and other furniture.

Li fled to the United States in 1990, fifteen months after the birth of his fourth child. He applied unsuccessfully for asylum in 1993. In 1996, the INS instituted deportation proceedings against him through the issuance of an Order to Show Cause. At his initial proceeding, Li conceded deportability, but continued to seek asylum and withholding of deportation. The merits proceeding on his asylum and

withholding of deportation claims did not occur until March 8, 1999.

The Immigration Judge (IJ) who heard the case denied Li's petition. The IJ based his decision largely on his finding that there was a "failure of proof." In particular, he found that Li had not presented sufficient documentation of the forced IUD, of his inability to obtain work, or of the very existence of a family unit. Li in fact presented documentary evidence of his marriage, registration cards for his four children, two photographs of his family, a receipt for the fine paid after the birth of the third child, and his factory dismissal certificate, but the IJ gave these minimal weight because they were unauthenticated.

The IJ also advanced an "alternative discretionary analysis" in which he found that even if Li would otherwise qualify for asylum, he would deny Li's petition as a matter of discretion because it was not reasonable for Li to have left his "sick wife and four minor children, an unemployed sick wife, no less, and a blacklisted wife, and taking, I guess whatever savings the family had and leaving for the United States."[1]

Li filed a timely appeal with the BIA on April 5, 1999. The BIA did not rely on the IJ's adverse credibility determination in denying the appeal. Indeed, the BIA acknowledged that Li "identified some error in the Immigration Judge's decision," but it nevertheless "agree[d] with the Immigration Judge's ultimate resolution." The BIA rested its denial of relief on the grounds that, "[e]ven assuming [Li] is credible, [he] failed to demonstrate past

persecution" because "when viewed in the aggregate, a fine, the confiscation of some personal property, and loss of a government job" do not constitute persecution. Moreover, the BIA found that "increased cost of tuition and medical care does not constitute persecution." The BIA did not make any other findings or conclusions analyzing Li's testimony regarding economic deprivation, nor did the opinion address Li's claim that he and his wife were threatened with sterilization, forced abortion, incarceration, and other physical abuse.

The BIA also found that Li did not establish he had a well-founded fear of future persecution, noting that

in light of [Li's] ability to live unfettered for 15 months before leaving China, his wife's ability to continue living in China without sterilization, and the ages of the respondent and his wife, [Li] failed to sustain the burden of proving a well-founded fear of future persecution on account of the coercive population control policies in China.

Because it based its decision on the legal conclusion that Li's allegations did not rise to the level of persecution, the BIA declined to address the validity of the IJ's "alternative discretionary rationale," or the IJ's adverse credibility determination.

## II. JURISDICTION, SCOPE OF, AND STANDARD OF REVIEW

The BIA had jurisdiction over this matter pursuant to 8 C.F.R. § 3.1(b)(3) (2003). Because petitioner's deportation proceedings began with an Order to Show Cause

---

1. We note that Li's testimony was that his wife had a gynecological condition, but he could not specify the nature of the illness, and he testified that she was able to care for the children and to work with this condition. Moreover, Li's testimony was that his wife told the Chinese authorities about her illness as a means of avoiding forced abortion or sterilization, but it is unclear whether such illness was in reality severe. He stated, "[S]he went to explain to birth control officials that, that was something wrong with her, but how she explained to them, I didn't know."

issued by the Immigration and Naturalization Service on June 26, 1996, this matter falls under the Transitional Rules set forth in section 309(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996). Our jurisdiction, therefore, is governed by former section 106(a) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1105a(a), which provides the exclusive procedure for judicial review of all final orders of "deportation and exclusion" in proceedings initiated prior to April 1, 1997. The BIA's final order was entered on March 4, 2003, and the petition for review was timely filed on April 3, 2003. *See* IIRIRA § 309(c)(4)(C).

 Where, as here, the BIA issues a decision on the merits and not simply a summary affirmance, we review the BIA's, not the IJ's, decision. *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir.2002). We must treat the BIA's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Lukwago v. Ashcroft*, 329 F.3d 157, 167 (3d Cir.2003). Moreover, " 'persecution' and 'well-founded fear of persecution' are ... findings of fact that we review under the deferential substantial evidence standard," and thus the BIA's findings must be upheld "unless the evidence not only supports a contrary conclusion, but compels it." *Abdille v. Ashcroft*, 242 F.3d 477, 483–84 (3d Cir.2001). Therefore, we must uphold the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

### III. DISCUSSION

 Under 8 U.S.C. § 1158(b)(1), the Attorney General may grant asylum to an alien who is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42). Generally speaking, an applicant must show that he or she:

> is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [the country of such person's nationality or in which such a person last habitually resided] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion: . . .

8 U.S.C. § 1101(a)(42)(A). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). While asylum constitutes discretionary relief, an applicant is entitled to withholding of removal if he or she can satisfy the higher burden of demonstrating that it is more likely than not that life or freedom would be threatened because of a protected ground if he or she were removed. 8 U.S.C. § 1231(b)(3)(A) (1999); *Miah v. Ashcroft*, 346 F.3d 434, 439 (3d Cir.2003).

Especially relevant here is the fact that the IIRIRA amended § 1101(a)(42) by specifying that:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Therefore, to be deemed to have been a "refugee" under Section 1101(a)(42), Li must establish that he was persecuted for "failure or refusal" to undergo involuntary sterilization or for "other resistance" to China's population control policy, or alternatively, that he has a well-founded fear of being persecuted for his resistance to the population control policy were he to be sent back to China.

The BIA has held that when a petitioner's spouse has suffered coerced sterilization or abortion, such persecution of the spouse is considered an act of persecution against the petitioner himself. *Matter of C–Y–Z–*, 21 I. & N. Dec. 915, 917 (BIA 1997) (en banc) ("[P]ast persecution of one spouse can be established by coerced abortion or sterilization of the other spouse."). *But see Cai Luan Chen v. Ashcroft*, 381 F.3d 221, 226–27 (3d Cir.2004) (finding it unnecessary to decide whether *C–Y–Z–* is a permissible interpretation of the IIRIRA, but noting that *C–Y–Z–*'s interpretation is "not without difficulties"). However, Li does not contend that his wife was either sterilized or forced to have an abortion; rather, he alleges that she refused such procedures and was able to avoid them because she claimed she was in poor health. Because Li has alleged that he personally resisted China's population control policy by fleeing to avoid his own sterilization and by agreeing to have a third and fourth child with his wife, we decline to address the issue of whether Li could establish an asylum claim based on his *wife's* failure or refusal to undergo forced abortion or sterilization or her resistance to China's population control policy under the *C–Y–Z–* rationale.

### A. Credibility

■ As a threshold matter, we must determine whether we need to consider the BIA's evaluation of Li's credibility in making our decision. While the IJ's adverse credibility determination was central to his denial of Li's claim, the BIA noted that Li had "identified some error" in the IJ's credibility finding and failure to consider documentary evidence. The BIA, however, did not make any credibility findings of its own. Thus, we are left only with the BIA's conclusion that, assuming Li was credible, he failed to establish past persecution as the basis for the BIA's denial of Li's past persecution claim. This rationale is all that we may review. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative decision by substituting what it considers to be a more adequate or proper basis."); *Ernesto Navas v. INS*, 217 F.3d 646, 658 n. 16 (9th Cir.2000) ("[T]his court cannot affirm the BIA on a ground upon which it did not rely.").

In *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir.2003), we held that where the BIA makes no findings on the credibility issue, "we must proceed as if [petitioner's] testimony were credible and determine whether the BIA's decision is supported by substantial evidence in the face of the assumed (but not determined) credibility." In *Kayembe*, the IJ relied on an adverse credibility determination to deny the petitioner's claim, but the BIA rested its affirmance on other grounds, without making a credibility determination. Also instructive is *Briones v. INS*, 175 F.3d 727 (9th Cir.1999) (en banc), where the BIA had taken note of the IJ's adverse credibility determination, but declined to address it, because the BIA found that Briones's testimony, even if it was credible, did not es-

tablish a well-founded fear of persecution. 175 F.3d at 728. Yet the Ninth Circuit, sitting en banc, analyzed the facts as alleged by the petitioner and found that the allegations were of a "compelling nature" such that, "if trustworthy," they would make out a claim for a well-founded fear of persecution. *Id.* The court then remanded to the BIA for credibility findings as to his claim.

Similarly, in the instant case, the BIA identified "some error" in the IJ's decision,[2] explicitly assumed credibility, and found Li had failed to even allege past persecution. Thus, in accord with *Kayembe* and *Briones*, we will review the BIA's legal conclusions assuming the credibility of Li's testimony.

### B. Past Persecution

Li testified to two categories of harm as a result of his resistance: 1) unfulfilled threats that he and his wife would be sterilized and/or physically harmed, and 2) economic harm.

#### 1. Unfulfilled Threats

Li testified that as a result of his violation of China's population control policy, he was threatened with sterilization and physical violence. After the birth of Li's fourth child, Li claimed, "At that time, my ... wife was in poor health, so they came to me. That means they want to capture me to ... have sterilization done to me." Li also claimed that he knew of a person at a neighboring factory who was arrested and

beaten after the birth of a fourth child. Officials at his own factory allegedly warned Li that if his wife did not have an abortion that they would "end up like them, we'll be captured, and will be beaten up."

It is established, however, that "[t]hreats standing alone ... constitute persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual 'suffering or harm.'" *Lim v. INS*, 224 F.3d 929, 936 (9th Cir.2000); *see also Guan Shan Liao v. United States Dep't of Justice*, 293 F.3d 61, 70 (2d Cir.2002).

We agree that unfulfilled threats must be of a highly imminent and menacing nature in order to constitute persecution. *See Boykov v. INS*, 109 F.3d 413, 416–17 (7th Cir.1997). For example, *Boykov* held that the petitioner, a Bulgarian national, had not suffered past persecution even though he had faced repeated threats by the Communist Party authorities who accused him of being critical of the government: Boykov's friend had disappeared and later was found murdered; he was warned by his boss, a Communist official, that he would lose his job or "something even worse could happen"; and he was visited by the police at his home, who threatened that "now ... it would be much easier for them to get rid of" him. *Id.* at 414–15. Similarly, in *Lim*, the Ninth Circuit found that a petitioner had not suffered past persecution where he had received repeated death threats for his role

---

**2.** Indeed, while we review only the decision of the BIA, we note that the IJ erred in imposing a strict authentication requirement, which we have subsequently rejected in *Gui Cun Liu v. Ashcroft*, 372 F.3d 529 (3d Cir.2004). *See also Leia v. Ashcroft*, 393 F.3d 427, 2005 WL 14808 (3d Cir. Jan.4, 2005). In *Gui Cun Liu*, a case where the IJ gave no weight to a certificate of abortion allegedly from Chinese officials, we held that "asylum applicants can

not always reasonably be expected to have an authenticated document from an alleged persecutor." 372 F.3d at 532. We found that it was legal error for the IJ to impose an absolute rule of exclusion on the basis of authentication, and that such improper rejection of unauthenticated documents could "fundamentally upset[] the balancing of facts and evidence upon which the agency's decision is based." *Id.* at 533–34.

in investigating and prosecuting a dissident group, and his colleagues who also took part in the investigation were in fact murdered one by one. 224 F.3d at 932–33. The Court noted that Lim lived in the Philippines for six years after receiving the threats without meeting any harm, albeit with the aid of a personal bodyguard and some police protection. *Id.* Notwithstanding the threats' sinister and credible nature, in both *Boykov* and *Lim,* the courts held that unfulfilled threats, even death threats, did not qualify as past persecution unless highly imminent.[3]

■ The threats of physical mistreatment, detention, or sterilization described by Li do not appear to have been sufficiently imminent or concrete for the threats themselves to be considered past persecution. As in *Boykov* and *Lim,* neither Li nor any of Li's family members were actually imprisoned, beaten, sterilized, or otherwise physically harmed. While certainly disturbing, Li's concern that he would be forced to undergo sterilization, and his supervisor's comments that he could be arrested and beaten, were less imminent and less menacing than the ominous threats faced by petitioners in *Boykov* and *Lim,* which were not found to constitute past persecution.

3. Rather than consider such threats past persecution, *Boykov* and *Lim* recognized that unfulfilled threats are generally "within that category of conduct indicative of a danger of future persecution." *Lim,* 224 F.3d at 936; *see also Boykov,* 109 F.3d at 416. Moreover, *Lim* recognized that as a matter of proof, "claims of threats are hard to disprove," and so "flipping the burden of proof every time an asylum applicant claimed that he had been threatened would unduly handcuff the [government]." *Id.* Unfulfilled, non-imminent threats are properly addressed when considering whether a petitioner has a well-founded fear of *future* persecution.

Therefore, we hold that the unfulfilled threats described by Li do not constitute past persecution.[4]

### 2. Economic Harm

The INA does not provide a statutory definition of the term "persecution." *See* 8 U.S.C. § 1101(a)(42) (defining "refugee" status in terms of "persecution"). We must, therefore, determine under what circumstances economic restrictions may rise to the level of persecution.

Prior to 1965, section 243(h) of the INA, 66 Stat. 212, 214 (enacted June 27, 1952), required a petitioner to demonstrate that he suffered from *"physical* persecution" in order to qualify for withholding of deportation.[5] The import of the requirement that persecution be "physical" was highlighted in *Blazina v. Bouchard,* 286 F.2d 507, 511 (3d Cir.1961), where we held that

> [b]efore the Attorney General may grant relief under Section 243(h) it must be shown to his satisfaction that, if deported, the alien would be subject not only to persecution, but to physical persecution. . . . The phrase "physical persecution" should be taken to mean confinement, torture or death inflicted on account of race, religion, or political viewpoint.

4. If we were to consider whether Li has demonstrated a well-founded fear of future persecution, we would address his testimony regarding unfulfilled threats at that time. Because the BIA failed to properly address the past persecution claim, however, we do not reach Li's claim that he has a well-founded fear of future persecution.

5. The 1952 version of Section 243(h) of the INA provided: "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."

One year after *Blazina,* in *Dunat v. L.W. Hurney,* 297 F.2d 744, 746 (3d Cir. 1962), we recognized that economic restrictions could constitute "physical persecution," but only where such restrictions prevented an applicant from *any* opportunity of earning a livelihood. We reasoned in *Dunat*

> [T]here is no basis for thinking that "physical persecution" requires or even connotes the use of intense physical force applied to the body with all the dramatics of the rack and the wheel. The denial of an opportunity to earn a livelihood in a country such as [communist Yugoslavia] is the equivalent of a sentence of death by means of slow starvation and none the less final because it is gradual.

*Id.*

In 1965, however, Congress amended the Immigration Act by deleting the adjective "physical" from the term "physical persecution." INA, Pub.L. No. 89–236, § 11(f), 79 Stat. 918 (Oct. 3, 1965). In *Kovac v. INS,* 407 F.2d 102, 106–07 (9th Cir.1969), the Ninth Circuit found that by deleting the word "physical" and so as to require only "persecution," not "physical persecution," Congress intended to remove the requirement that applicants show that economic harm was so severe as to cause bodily injury. By this reasoning, the panel found that the 1965 Amendment "eliminated the premise upon which courts construing the old statute . . . based the rule that, to come within the reach of section 243(h),

a denial of employment opportunities must extend to all means of gaining a livelihood." *Id.*

Because of the new terminology regarding persecution in the INA, *Kovac* introduced a new standard for withholding of deportation claims: "Under the amended statute, therefore, a probability of *deliberate imposition of substantial economic disadvantage* upon an alien for reasons of race, religion, or political opinion is sufficient to confer upon the Attorney General the discretion to withhold deportation." 407 F.2d at 107 (emphasis added). In *Borca v. INS,* 77 F.3d 210, 216 (7th Cir. 1996), the Seventh Circuit extended *Kovac'* s reasoning to both asylum and withholding of deportation (now withholding of removal, *see* note 6, *infra* ) claims.

Since the 1965 amendment, the Immigration and Naturalization Act has undergone considerable alteration and amendment, but the basic principle that *physical* persecution is no longer statutorily required remains intact. Without going through an exhaustive history of the INA, we simply note a few major amendments to the relevant statutory sections in the margin.[6]

█ This Court has had few occasions, following the 1965 amendment to the INA, to determine what types of economic restrictions might constitute persecution now that physical persecution is no longer required. Most notably, adopting the standard for persecution set forth by the BIA in *Matter of Acosta,* 19 I. & N. Dec. 211

---

6. The 1980 amendment to the INA replaced the term "persecution" with the term "threat to life or freedom" for withholding of deportation cases. "Threat to life or freedom" remains the standard governing withholding of removal in 8 U.S.C. § 1231(b)(3) under current law. At the same time, the 1980 amendment introduced the term "persecution" into the asylum context, which is the term used today for qualification as a refugee under 8 U.S.C. § 1101(a)(42). In 1996, the IIRIRA, *inter alia,* repealed the term "withholding of deportation" in 8 U.S.C. § 1253(h) and renamed it "withholding of removal," now codified at 8 U.S.C. § 1231(b)(3). *See* Pub.L. No. 104–208, § 307(a), 110 Stat. 3009 (Sept. 30, 1996). While the terminology and codification have changed, in substance the two provisions are the same.

(BIA 1985), in *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993), we defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Fatin* made clear that "persecution" denotes "severe" conduct and that, "persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country...." *Id.* at 1240.

Since *Acosta* and *Fatin* established the general standard for persecution in this circuit, we follow these precedents. However, neither case dealt directly with the issue of economic persecution, and so neither *Acosta* nor *Fatin* controls as a matter of factual application. *Fatin* questioned whether being forced to wear a chador and to comply with other religious laws constituted persecution of an Iranian woman who opposed Iran's gender-specific dress and religious requirements. *Id.* Similarly, *Acosta* did not involve any claim of economic disadvantage, but rather concerned a native of El Salvador who alleged he was physically assaulted and had his life threatened because of his involvement in a cooperative for taxi drivers. 19 I & N Dec. at 216–17. Moreover, the BIA has yet to cite *Acosta* or its economic persecution standard to clarify what it means by "economic restrictions so severe that they constitute a threat to life or freedom." Thus, neither *Fatin* nor BIA precedent illuminates the contours of an economic persecution claim.

*Ahmed v. Ashcroft,* 341 F.3d 214 (3d Cir.2003), is one of the only other cases in this circuit to address the issue of economic persecution since we established the *Fatin* standard. In *Ahmed,* we held that a former resident of Saudi Arabia had not established that he had suffered past economic persecution because of his Palestinian background. In that case, petitioner had faced employment discrimination, but nevertheless had attended a top Saudi Arabian university and had been employed in all but one year since his graduation. *Id.* at 217–18. Like *Fatin,* however, *Ahmed,* is clearly distinguishable from the instant case. Li testified that after losing his government job, he and his wife were effectively blacklisted from any legitimate employment, forcing him to get by with low-level, temporary employment while hiding out with friends in other parts of China. *Ahmed,* therefore, does not help us determine whether and when more severe economic restrictions may rise to the level of persecution. We are therefore left without factual analogies in BIA decisions or in our own Circuit's precedent to determine when economic restrictions should be recognized as persecution.

Many decisions of other Courts of Appeals have followed *Kovac'*s reasoning and have recognized economic harm as persecution where the alien can show that he or she was subjected to "deliberate imposition of substantial economic disadvantage" because of a protected ground. *See Baballah v. Ashcroft,* 367 F.3d 1067, 1075 (9th Cir.2004); *Eduard v. Ashcroft,* 379 F.3d 182, 187 (5th Cir.2004); *Guan Shan Liao v. United States Dep't of Justice,* 293 F.3d 61, 70 (2d Cir.2002); *Yong Hao Chen v. INS,* 195 F.3d 198, 204 (4th Cir.1999); *Borca v. INS,* 77 F.3d 210, 216 (7th Cir. 1996); *Berdo v. INS,* 432 F.2d 824, 847 (6th Cir.1970).

On the other hand, courts have emphasized that it is not sufficient for petitioner to merely have suffered from "natural, nonpunitive economic downturns" or from generally harsh conditions shared by others in the alien's native country; rather, such economic harm must be deliberately

imposed as a form of punishment. *Borca*, 77 F.3d at 216. Nor is it sufficient for a petitioner to have faced only economic discrimination or to have been denied his preferred job. *Ahmed, supra*, 341 F.3d at 217.

■ Informed by the reasoning of these cases, we hold that the deliberate imposition of severe economic disadvantage which threatens a petitioner's life or freedom may constitute persecution. (This is the *Acosta* standard). Such disadvantage might, for instance, involve "the deprivation of liberty, food, housing, employment, and other essentials of life." *See Eduard, supra*, 379 F.3d at 187. We turn to the application of this standard to the record in this case.

■ Assuming Li's testimony to be credible, *see* Part III.A, *supra*, the BIA found that "[a] fine, loss of a particular job, and confiscation of some personalty" do not rise to the level of persecution, even when viewed in the aggregate. It is unclear what legal standard the BIA used for determining when economic harm constitutes persecution.[7] Moreover, we agree with Li that the BIA mischaracterized the nature of the economic consequences Li faced because of his refusal to comply with China's population control policy. While we review any factual findings by the BIA under the highly deferential "substantial evidence" standard, *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), in this case, the BIA assumed Li to be credible, and concluded that Li's allegations do not make out a claim for economic persecution. After careful review of the record, assuming Li's credibility, we are satisfied that Li's allegations rise to the level of economic persecution and therefore that the BIA's decision was not supported by substantial evidence.

First, Li testified that the 1200 yuan fine, imposed after the birth of his third child, was equivalent to twenty months' salary. Although the BIA seems to have given little weight to this testimony, we believe this is an extremely onerous fine in relation to Li's income.[8] Second, the BIA's finding that Li lost a "particular job" understates the evidence in the record that the loss of a government job in China due to violations of the family planning policy constitutes the imposition of a se-

---

7. While the IJ was more explicit about the legal standard he employed, he appears to have set too high a bar for economic persecution. The IJ found that only when "a person is unable to make any type of livelihood, is unable to support himself and his family, then he may have been deprived of his freedom to such an extent that asylum may be an appropriate form of relief." The IJ went on to find that "[t]he family did manage to survive and no one starved and they all got by for that 15 month period following the time when [Li] lost his job with the government. So the act of losing the job was not in and of itself an act of persecution. The 1200 yuan fine was not in and of itself persecution...." While the standard for economic persecution is stringent, and the economic harm, in accord with *Fatin*, must be severe, we do not require complete loss of all means of earning a livelihood, nor do we require evidence of near-

starvation, for economic restrictions to rise to the level of persecution. *See Borca*, 77 F.3d at 216 (finding it unnecessary for a petitioner to establish a "utter lack of economic opportunity" to meet the standard for economic persecution).

8. Therefore, the testimony and evidence in this case is unlike that in *Liao*, 293 F.3d at 70, where the Second Circuit held that without evidence of "petitioner's income, his net worth at the time of the fines or any other facts that would make it possible ... to evaluate [petitioner's] personal financial circumstances in relation to the fines," the court could not determine whether petitioner had suffered "substantial economic disadvantage" as a result his violation of China's population control policy.

vere economic disadvantage. More specifically, the BIA's finding that Li lost only a "particular job" does not confront the testimony that Li was effectively blacklisted from any government employment and that it would be impossible for him to find another job.[9]

In *Borca, supra,* 77 F.3d at 215–17, the Seventh Circuit held that a radiologist who was barred from any government employment except for menial farm labor had suffered economic persecution. Being blacklisted from government employment is particularly significant in Li's case because Li is a mechanic who specializes in fixing large factory machines, his job at the Bridge Factory was the only job he ever held in China, and any unofficial jobs which Li was able to obtain did not employ his specialized skills. In both *Borca,* 77 F.3d at 215, and in *Kovac,* 407 F.2d at 104, the courts found it important that petitioners could not find work in the occupations in which they had specialized training—as a radiologist and a restaurant chef, respectively. While during the fifteen months between the birth of his fourth child and his flight to the United States, Li was able to get by with temporary, unofficial jobs, Li testified that he was effectively living on the run and afraid to apply for any official employment.

Additionally, the BIA's characterization of Li's testimony does not account for the significance of a government job in China, which, the record indicates, provides not only income, but also health coverage, food and medicine rations, and educational benefits. Moreover, the BIA did not address Li's testimony that his wife also lost her employment as a nurse and has been un-able to obtain new employment because of the family's violation of China's population control policy. Li testified that his wife has not been employed since the birth of her fourth child and that his family is supported by money he sends from his job in the United States.

Finally, the magnitude of the confiscation of the Lis' household items seems more substantial than "some personalty." Authorities confiscated their refrigerator, television, and other household items that Li argues were "significant objects, especially to an impoverished family such as the Lis."

In sum, while Li's family did not reach near-starvation levels, we can fairly say that the economic restrictions allegedly faced by the Li family were "severe." In the aggregate, a fine of more than a year and a half's salary; blacklisting from any government employment and from most other forms of legitimate employment; the loss of health benefits, school tuition, and food rations; and the confiscation of household furniture and appliances from a relatively poor family constitute deliberate imposition of severe economic disadvantage which could threaten his family's freedom if not their lives. Moreover, the economic harm in Li's case was deliberately imposed as a form of punishment because of his violation of China's population control policy, rather than being the result of "natural" economic downturns or generally harsh conditions shared by others in China. We hold that, when viewed in the aggregate, Li's allegations amount to economic persecution.

9. It is possible that the blacklisting of Li and his wife, as the dissent suggests, was caused by their voluntary departure from their employment rather than their violations of national birth control policy. That is not a necessary inference from Li's testimony, however, and a contrary inference is a clearly permissible one if that testimony is fully credited. We, of course, leave that issue for resolution by the trier of fact on remand.

## IV. CONCLUSION

The basis of the BIA's decision was that, even if Li were credible, his allegations do not rise to the level of past persecution. We must review the BIA's decision to deny Li's appeal based solely on the grounds relied upon by the BIA, and thus, like the BIA, we must assume credibility. Assuming Li's allegations to be true, we hold that Li did establish a claim for economic persecution. Accordingly, we will grant Li's Petition to Review the Order of the BIA, vacate the BIA's order, and remand the matter to the BIA for further proceedings on the credibility issue.

SLOVITER, Circuit Judge, dissenting.

The majority's concern for the economic plight of Zhen Hua Li is admirable but the question before us is whether that plight is a result of economic persecution. The primary basis for the majority's determination that there was "persecution" is that Li was terminated from his government position and his wife from hers. Is this court ready to take the position that a government that terminates the employment of one of its workers who violated its laws not once but twice [10] is persecuting that employee by terminating his employment? If the government then declines to hire the employee in another position, is that persecution? Does it become persecution because the government then fines the employee for violation of its laws? And finally, if the employee is unable to find a comparable non-government position, does it then rise to the level of persecution? I dissent from the judgment of the majority because I believe its opinion is flawed as to the relevant facts and as to the relevant law, particularly in that it departs from this court's precedent.

### I.

To qualify for asylum, the alien must demonstrate that s/he is a "refugee," which entails establishing that s/he is "unable or unwilling to return to ... that country [of nationality] *because of persecution* or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42) (emphasis added).

The Refugee Act of 1980 introduced the term "persecution" into the context of asylum. Congress chose not to define "persecution" in the Refugee Act, nor has any legislative definition been enacted in the interim. In *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), the BIA determined that "Congress, in using the term 'persecution' in the definition of a refugee under section 101(a)(42)(A) of the Act, intended to adopt the judicial and administrative construction of that term existing prior to the Refugee Act of 1980." *Id.* at 223.[11] The BIA cited a number of administrative and federal appellate decisions which in aggregate stand for the proposition that before 1980 " 'persecution' was construed

---

**10.** The majority assumes that the applicable policy at the relevant time limited the family to two children. *See* Maj. at 160. From that we deduce that a family with four children, as the Lis admittedly have, has violated the policy twice.

**11.** The BIA reasoned that "[i]t is a basic rule of statutory construction that words used in an original act or section, that are repeated in subsequent legislation with a similar purpose, are presumed to be used in the same sense in the subsequent legislation." *Acosta*, 19 I. & N. Dec. at 223 (citing *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)). Only "2 years before enacting the Refugee Act of 1980, Congress chose not to define the word 'persecution' when using it in other provisions of the Act because the meaning of the word was understood to be well established by administrative and court precedents." *Id.*

to mean either a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive. The harm or suffering inflicted could consist of confinement or torture. *It also could consist of economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom."* *Id.* at 222 (citations omitted) (emphasis added).

Following *Acosta*, various courts of appeals have evolved separate, yet closely related prudential constructions of the term "persecution." *See Aguilar–Solis v. INS*, 168 F.3d 565, 569 (1st Cir.1999) ("Congress has not defined the term 'persecution,' and the courts thus far have failed to achieve a general consensus on its meaning and scope in this context."); *see, e.g., Mansour v. Ashcroft*, 390 F.3d 667, 681 (9th Cir.2004) ("The definition of persecution that our court applies is a creation of purely our own case law."). The definitions of "persecution" given by these courts range from the more expansive constructions adopted by the Fifth, Seventh, Ninth, and Tenth Circuits,[12] to the much narrower construction used by the Eighth

Circuit, *see, e.g., Rife v. Ashcroft*, 374 F.3d 606, 612 (8th Cir.2004) ("Persecution is the infliction or threat of death, torture, or injury to one's person or freedom on account of a statutory ground ...." (citations omitted)).[13]

In *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993), this court set forth our construction of "persecution." We defined the term as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom;" a definition essentially the same as that adopted by the BIA in *Acosta*. *Id.* at 1240. We made clear that persecution refers only to "severe" conduct and "does not encompass all treatment our society regards as unfair, unjust or even unlawful or unconstitutional." *Id.* We emphasized that were a more expansive definition adopted "a significant percentage of the world's population would qualify for asylum in this country—and it seems most unlikely that Congress intended such a result." *Id.; see also Ahmed v. Ashcroft*, 341 F.3d 214, 217 (3d Cir.2003).

---

**12.** *See, e.g., Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir.2004) ("[W]e have held that a finding of persecution 'requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive' and must entail 'more than just restrictions on threats to life and liberty'" (citing *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (10th Cir.2001))); *Borca v. INS*, 77 F.3d 210, 215 (7th Cir.1996) ("a threat to life or freedom is not necessarily a persecution prerequisite."); *Abdel–Masieh v. INS*, 73 F.3d 579, 583–84 (5th Cir.1996) (defining persecution as "[t]he infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.,* race, religion, political opinion, etc.), in a manner condemned by civilized governments."); *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995) (defining persecution as "the infliction of suffering or harm upon those who differ (in race, religion

or political opinion) in a way regarded as offensive." (citations omitted)).

**13.** Other courts of appeals evaluate claims of persecutions on a case-by-case basis, without adopting a formalized working definition of the term. *See, e.g., Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir.2004) ("This Court has held that persecution ... requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." (internal quotations omitted)); *Manzoor v. United States Dept. of Justice*, 254 F.3d 342, 346 (1st Cir. 2001) ("[W]e can say that while persecution is not restricted to threats to life or freedom, it requires more than 'mere harassment or annoyance.'" (citations omitted)); *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir.2000) (citing cases from the Seventh and Ninth Circuit).

Admittedly, our definition of persecution differs from that of circuits such as the Seventh Circuit, which has stated that "a threat to life or freedom is not necessarily a persecution prerequisite." *Borca v. INS*, 77 F.3d 210, 215 (7th Cir.1996). Despite this potential tension, the *Fatin* standard continues to govern our evaluation of asylum claims. The majority's effort to cabin *Fatin* to the situation of an Iranian woman being forced to wear a chador and to comply with other religious laws belittles the force of that precedential opinion. In an unbroken line of cases, we have applied *Fatin* to fact patterns far afield from the requirement to wear a chador and to comply with other religious law. *See Ambartsoumian v. Ashcroft*, 388 F.3d 85, 93 (3d Cir.2004) (applying *Fatin* standard to a claim of ethnic and religious persecution in Ukraine); *Chen v. Ashcroft*, 381 F.3d 221, 231 (3d Cir.2004) (applying *Fatin* standard to a claim of persecution under China's population control program); *Lukwago v. Ashcroft*, 329 F.3d 157, 167–68 (3d Cir.2003) (applying *Fatin* standard to a claim by petitioner that he was forcibly conscripted into a guerilla organization); *Lin v. INS*, 238 F.3d 239, 243–44 (3d Cir.2001) (applying *Fatin* standard to petitioner's claims that he had a well-founded fear of future persecution for his participation in Tiananmen Square demonstrations); *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir.1997) (applying *Fatin* standard to petitioner's claim that he has a well-founded fear of future persecution, if returned to China, on the basis of his political opinion).

This court, as well as others, has recognized that following the 1965 amendment to the INA deleting the requirement that persecution be "physical," INA, Pub.L. No. 89–236, § 11(f), 79 Stat. 918 (1965), the definition of "persecution" encompasses not only physical persecution but also economic persecution. *See, e.g., Ahmed*, 341 F.3d at 217–18 Since then, several circuits have adopted the formulation first coined by the Ninth Circuit in *Kovac v. INS*, 407 F.2d 102 (9th Cir.1969), that a "deliberate imposition of *substantial* economic disadvantage upon an alien for reasons of race, religion, or political opinion" constitutes persecution. *Id.* at 107 (exploring economic disadvantage in the withholding of removal context) (emphasis added); *see* Maj. 167 (citing cases from the Second, Fourth, Fifth, Seventh, and Ninth Circuits).[14]

To the extent that the majority's adoption of the Ninth Circuit's *Kovac* standard suggests a weakening of the standard previously applied to find "persecution," it is unwarranted. The standard for "economic persecution," must accord with the overarching prudential standard adopted for persecution claims in general. In other words, a standard for economic persecution must not be more expansive than the standard for physical persecution. The 1965 amendments do not reveal a contrary congressional intent. Thus, whereas our definition of persecution in *Fatin* may contain language suggesting that it is more exacting than the standard of persecution adopted by the Ninth Circuit, so also must be our definition of economic persecution.[15]

---

**14.** *Kovac* was later extended to the asylum context by *Borca v. INS*, 77 F.3d 210, 217 (7th Cir.1996).

**15.** We note that the *Kovac* standard for economic persecution mirrors the Ninth Circuit's relatively expansive standard for persecution in general. *See, e.g., Ghaly*, 58 F.3d at 1431

(9th Cir.1995) (defining persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion)) in a way regarded as offensive." Likewise, other circuits that have adopted the *Kovac* standard appear to have broader definitions of persecution than the standard adopted by this Court.

In expressing our own formulation of economic persecution, *see Acosta,* 19 I. & N. Dec. at 222, we should give due deference to the reasonable interpretations of the BIA.[16] *See Chevron,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program"); *Smriko v. Ashcroft,* 387 F.3d 279, 297 (3d Cir.2004) ("We are *required* to 'accord [ ] *Chevron* deference [to the BIA] as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication.'" *quoting Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)); *Bamidele v. INS,* 99 F.3d 557, 561 (3d Cir.1996) ("We, of course, also acknowledge the general applicability of *Chevron's* analysis to our review of an agency's interpretations of its governing statutes.").

The majority opinion, in defining economic persecution as "the deliberate imposition of severe economic disadvantage which threatens a petitioner's life or freedom," purports to recognize the interpretation given by the BIA and by this court in *Fatin.* Maj. at 168. However, it is disingenuous to use the words of the governing precedent to give the appearance of following in that path while in reality applying a far different standard. Rather than considering whether the restrictions on the Lis were "so severe that they constitute a threat to life or freedom," the majority applies instead the more expansive standard of "substantial economic disadvantage" used by the Ninth Circuit in the *Kovac* case. That is simply not the same standard as "a threat to life or freedom," and smoke and mirrors cannot make them comparable.[17] In any event, the facts of record show that under any court's definition of economic persecution, Li has not made the necessary showing.

## II.

A review of the record puts Li's position in a far different light than does the majority's opinion. Even assuming that we must take Li's credibility as established, his own testimony and affidavit show that the circumstances surrounding his asylum claim do not amount to economic persecution.

Both he and his wife left their jobs in anticipation of, not as a result of, the government's response to their non-compliance with the government's population control policy. The majority itself holds that the unfulfilled threats described by Li do not constitute past persecution. Maj. at 164–65. It follows that such threats can-

16. The BIA stated in *Acosta:*

> Prior to 1980, "persecution" was construed to mean either a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive. *See, e.g., Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969); *Matter of Maccaud,* 14 I & N Dec. 429, 434 (BIA 1973); *Matter of Dunar,* supra, at 320; *Matter of Diaz,* 10 I & N Dec. 199, 200 n. 1 (BIA 1963); *see also Matter of Laipenieks,* 18 I & N Dec. 433, 456–57 (BIA 1983). The harm or suffering inflicted could consist of confinement or torture. *See Blazina*

> *v. Bouchard,* 286 F.2d 507, 511 (3d Cir. 1961). It also could consist of economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom. *See, e.g., Dunat v. Hurney,* 297 F.2d 744, 746 (3d Cir.1962); *Matter of Salama,* 11 I & N Dec. 536 (BIA 1966); *Matter of Eusaph,* 10 I & N Dec. 453, 454 (BIA 1966).

> 19 I. & N. Dec. at 222.

17. Indeed the majority's factual analysis cites *only* the Seventh Circuit's decision in *Borca* and the Ninth Circuit's decision in *Kovac.*

not be used to excuse the Lis' unauthorized departure from their jobs. Li's testimony makes clear that he ran away from his job after his fourth child was born because he was afraid he would be beaten, as happened to a factory worker in a neighboring factory after he had a fourth child.

> A. We were frightened and the officials also told us, told us if I don't, if we don't go to abortion then we will be, end up like them, we'll be captured and will be beaten up.
>
> Q. Okay. So, what did you do next?
>
> A. Not, not long before my, the child was born I have decided to leave that factory.
>
> Q. And, were did you go?
>
> A. Then I, I went to Woo Haun (phonetic sp.) City and the Chung Zua (phonetic sp.) City to hide. To hide away.

App. at A–31.

Li's affidavit makes clear that it was *after* he ran away and hid and after the fourth child (a third boy) was born on April 19, 1989 that his wife received notice that he was officially fired from his job on April 30, 1989. App. at A–103.

Li's wife also left her job at the hospital where she worked, despite the fact that her job was never officially terminated. Li's affidavit states:

> My wife was also being pressured by her superiors at her workplace and threatened with fines and other punishment, so she took our three kids to the countryside to stay with a friend. We could not go into hiding together because in order to earn money I had to stay close to the city where there was no place there for my wife and children to stay. My wife was unable to earn money because of her pregnancy and the need to take care of our children.

App. at A–103. Although the Lis were threatened with the possible termination of their jobs, they were not terminated until they actually left. The termination of a departed employee hardly constitutes persecution.

There is also no evidence that Li was "blacklisted," as the majority states. He did not apply for a government job in any other region of China, which is vast, nor did he apply for a private industry job. He merely assumed he would be unable to find one if he had applied. App. at A–33 ("[b]ecause I have violated the birth control policy, *most* companies would not hire me." (emphasis added)).

The majority portrays the fine imposed on Li as draconian. Li's own testimony does not so portray it. The Lis apparently anticipated that violation of China's population control policy would be followed by imposition of a fine, but the amount of Li's fine after the birth of his third child does not appear to have created the economic hardship the majority assumes. Li's testimony makes that clear:

> Q. Did you pay the fine, this 1200 yuan fine, did you ever pay that fine?
>
> A. Yes, I paid that.
>
> Q. And, how did you manage to pay a fine that was so large?
>
> A. At that time me and my wife both working and so we had some savings.
>
> Q. And, where did you pay that fine?
>
> A. It's about, over 10, 20 days after the third child was born, so we went to pay the fine.
>
> Q. That was '87?
>
> A. Yes.

App. at A–55.

The majority in its discussion of the effect of the 1200 yuan fine that constituted the equivalent of twenty months of Li's salary never acknowledges that Li's wife also worked, and the record does not show

the amount of her earnings. Nor does the majority even consider that as a result of the dual income the family may have had savings, a fact to which Li testified. It follows that while the fine may have been substantial, the majority's characterization of the fine as "an extremely onerous fine in relation to Li's income" is not supported by the record. Maj. at 168.

The other economic effects of Li's violation of China's population control policy also do not rise to the level of persecution under any court's standard. Once the Lis left their positions, it is not surprising that they would also have forfeited some of the benefits that accrue to government workers, such as health benefits, school tuition and food rations. The taking of some of the Lis' property is deplorable, but the majority makes more of it than does Li. Li's affidavit states that he was informed that officials confiscated their "refrigerator and television," which he noted was private property purchased with their own money. App. at A–103. The latter is significant because the Lis lived in an apartment provided by the factory ("we all live in the factory's dorm, the factory's assigned apartments....", App. at A–37) and there is nothing to show whether the officials who confiscated the refrigerator and television believed that those items were provided by the factory. Thus, while the economic restrictions imposed on Li may have been "substantial," any argument that they were so severe as to constitute threats to life or freedom is undercut by Li's own assertion that during the fifteen

months between the birth of his fourth child and his flight to the United States, he was able to support his family through temporary unofficial jobs.[18] There is an evident contradiction in the majority's conclusion that "while Li's family did not reach near-starvation levels," the economic disadvantage he purportedly suffered "could threaten his family's freedom if not their life." Maj. at 169.

Finally, although we may not agree with China's coercive population control policy, a policy I note that was instituted to avoid the true starvation that would result for many of its 1.3 billion people were the population growth to continue unabated, I believe that the record substantially supports the BIA's conclusion that "[a] fine, loss of a particular job, and confiscation of some personalty do not rise to the level of persecution, even when viewed in the aggregate." App. at A–5.

### III.

I cannot refrain from a personal note. It appears that our immigration policy has significantly changed from the welcoming words on the Statute of Liberty.[19] As much as some of us may wish to return, at least in part, to the days of more open doors, it is our duty as federal judges to follow the immigration policies enacted by Congress. For the foregoing reasons, I would deny the petition for review.

**18.** The majority relies heavily on *Borca*, 77 F.3d at 215, and *Kovac*, 407 F.2d at 104, where the Seventh and Ninth Circuits found important, for purposes of evaluating whether petitioners had suffered economic persecution, the fact that petitioners could not find work in the occupations in which they had specialized training. Under our doctrine of economic persecution, which requires restrictions so severe that they constitute a threat to

an individual's life or freedom, *Borca* and *Kovac* are not controlling.

**19.** "Give me your tired, your poor, Your huddled masses yearning to breathe free, The wretched refuse of your teeming shore, Send these, the homeless, tempest-tossed, to me: I lift my lamp beside the golden door." Emma Lazarus