FUENTES, Circuit Judge,
Concurring.
This is a close case, but, in light of the substantial evidence standard of review, I ultimately conclude that the record does not compel a grant of the petitions.
I.
Because the key to this case is context, I first review the facts of this case, as presented in the Bedoyas’ testimony.[1] Rigoberto served as a member of the Colombian national police force tasked with investigating, among other things, crimes committed by FARC. In 1983, he began his service as secretary for police inspections at the Andes police station, overseeing six uniformed policemen. After a bombing and death threats, Bedoya’s colleagues abandoned their posts. By 1992, he was the only police officer in the town, serving as its inspector of police. Alone on the front lines of a four-decades long conflict between the Colombian government and paramilitary groups, Bedoya came to suspect that an uncle and a cousin were murdered by FARC. When he investigated their deaths, armed members of that group retaliated by walking into the police station and threatening to murder him. Bedoya reported the threat to the mayor and the Colombian government sent military forces to the area for a short period of time. Bedoya remained for another year, but eventually left when he heard rumors that FARC guerillas were going to carry out their threat.
Bedoya and his family moved to the city of Medellin in 1993, but moving did not make them feel safe. FARC continued to haunt Bedoya, calling and threatening to kill him unless he paid them money. For several years, Bedoya refused to give in to FARC’s demands or leave yet another home. Eventually, he fled to the United States. After he left, FARC began to *101 terrorize his sister, Girlesa. She testified that, after Rigoberto’s departure, FARC called and threatened to kill her unless she told them his location. She, too, finally decided that the threats were serious and followed her brother to the United States.
Rigoberto testified that he always intended to go back to Colombia once it was safe. However, in 1999 another of his uncles was murdered. According to Rigoberto, FARC committed the crime because of Rigoberto’s association with the Colombian police force. In 2003, Rigoberto returned to Colombia for 25 days to determine for himself whether it was safe to return with his family. His relatives told him it was not. Rigoberto investigated further and discovered that several of his former colleagues in the Colombian national police had been assassinated by FARC. Ultimately, he concluded that Colombia was not safe and returned to the United States.
Bedoya’s decision to flee Colombia is reminiscent of the facts in Espinosa-Cortez v. Attorney General, 607 F.3d 101 (3d Cir.2010). As the Majority explains, the petitioner in that case was a wealthy businessman with ties to high-ranking members of the Colombian government and military who was threatened by FARC with death unless he agreed to betray his country. Bedoya’s case is different from Espinosa-Cortez’s, but the differences are largely ones of class and status. Bedoya, like Espinosa-Cortez, was associated with the Colombian government and would not have come to FARC’s attention but for his position as a police inspector; and Bedoya, like Espinosa-Cortez, had members of his family threatened. A major difference is that some of Bedoya’s friends and family were murdered by members of FARC.
While it is an extremely close call, I ultimately agree with my colleagues that Espinosa-Cortez had a stronger case. The evidence in Espinosar-Cortez compelled us to grant the petition: EspinosaCortez was specifically targeted by FARC for recruitment, the threats were extensive, and FARC manifested its clear intent to carry out those threats when it intercepted Espinosa-Cortez’s daughter on her way home from school. The evidence in Bedoya’s ease is not as compelling: he was not targeted for recruitment, the threats against him were more sporadic, and after the threats were issued, there was no further conduct demonstrating that the threats were “highly imminent and menacing.” See Li v. Att’y Gen., 400 F.3d 157, 164 (3d Cir.2005).
In short, despite some misgivings, I conclude that there is substantial evidence in the record to support the BIA’s decision.
II.
I do disagree with the Majority on two points. In my view, it is incorrect to imply that aliens claiming persecution on account of threats cannot obtain withholding of removal unless the harm caused by the threats manifests itself in a physical ailment requiring medical attention. After all, if physical harm is required before a threat constitutes persecution, EspinosaCortez’s petition would not have been granted. Here, the BIA stated that “the threats against [petitioners], which were unfulfilled, did not constitute past persecution.” App. at 2 (emphasis added). I cannot imagine that the BIA meant that the threat to kill had to be fulfilled before it could amount to persecution.
Second, the Majority implies that even if the threats to the Bedoyas constituted past persecution, any resulting presumption of future persecution is adequately rebutted by changes in Rigoberto’s personal circumstances since he left Colombia. I do not think this is an appropriate factor to con *102 sider in evaluating withholding of removal because improvement in personal circumstances will almost always be the case when an immigrant flees persecution.
III.
In light of the highly deferential standard of review in this case, I concur in the judgment on the ground that there is substantial evidence.

. The IJ assumed, for the sake of argument, that the facts were as stated in the Bedoyas’ testimony and concluded as a matter of law that the evidence did not establish past persecution. App. at 19. Like the IJ, I assume that the facts presented in the Bedoyas' testimony are true.