**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 20-2451

———————————

FLOREA CIUPANGEL,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

———————————

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No.: A209-426-093)
Immigration Judge: Jeffrey L. Menkin

———————————

Submitted Pursuant to LAR 34.1(a) on
March 12, 2021

Before: SMITH, *Chief Judge*, MCKEE, and AMBRO, *Circuit Judges*

(Opinion filed: August 19, 2021)

———————————

OPINION*

———————————

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

McKEE, *Circuit Judge*

Florea Ciupangel, a citizen of Romania who is of Roma ethnicity, seeks review of the BIA's final order of removal. The BIA affirmed an Immigration Judge's denial of Ciupangel's application for asylum, withholding of removal, and protection under the Convention Against Torture. The Board agreed with the IJ's determination that Ciupangel had not established a pattern or practice of persecution of the Romani population in Romania. For the reasons that follow, we will deny the petition.[1]

**I.**

Ciupangel claims that the IJ failed to properly apply the standard for persecution and that it focused only on evidence of physical violence against Ciupangel's family and Roma rather than the many non-physical harms Roma face.[2] We review questions of law *de novo*, including whether the correct legal standard was applied.[3]

Ciupangel is incorrect in claiming that the IJ erred in resolving his claim of persecution in its January 29, 2020 decision.[4] The IJ defined persecution as "a threat to

---

[1] We have jurisdiction to review the BIA's order under 8 U.S.C. § 1252(a)(1).
[2] We note that Ciupangel also asks us to clarify the systemic, pervasive, or organized standard. Petitioner's Br. at 35 ("[T]he *systemic, pervasive* or *organized* standard lacks a clear legal definition, making application more difficult and misapplication more likely."). We decline to do so at this time as it is not necessary for the resolution of this case.
[3] *Vakker v. Att'y Gen.*, 519 F.3d 143, 146 (3d Cir. 2008).
[4] Ciupangel refers to this decision as the January 30, 2020 decision; it is captioned January 29, 2020 and signed on January 30, 2020.

2

the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive" and appropriately applied that definition to the facts.[5]

Ciupangel's assertion that the IJ "focuse[d] exclusively" on the physical harms is also belied by the record.[6] The IJ noted that police violence against Roma "is one of the principal human rights concerns in Romania today," but the IJ also addressed the evidence Ciupangel provided and explicitly concluded that "discrimination and mistreatment of Roma as it relates to housing, employment, education, and health care . . . do[] not rise to the level of persecution contemplated under the Act."[7]

Ciupangel did not satisfy his burden of establishing that such harm is sufficient to constitute a pattern or practice as required to qualify for relief from a removal order. To amount to a pattern or practice, persecution must be "systemic, pervasive, or organized."[8] We have explained that persecution under the INA includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom."[9] However, "[g]enerally harsh conditions" do not constitute persecution.[10] "Persecution is an extreme concept" and "[a]busive treatment and harassment, while always deplorable, may not rise to the level of persecution."[11]

---

[5] App. 29 (citing *In re Acosta*, 19 I&N Dec. 211, 222 (BIA 1985); *Li v. Atty Gen.*, 400 F.3d 157, 164-68 (3d Cir. 2005)).
[6] *See* Petitioner's Br. at 34.
[7] App. 32.
[8] *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005).
[9] *Fatin v. I.N.S.*, 12 F.3d 1233, 1240 (3d Cir. 1993).
[10] *Id.* (internal citation omitted).
[11] *Jarbough v. Att'y Gen.*, 483 F.3d 184, 191 (3d Cir. 2007).

3

We appreciate the Romani's economic disadvantages, lack of access to education and health care, and unequal access to legal remedies. However, we agree with the BIA's conclusion that such deprivations do not rise to the level of a pattern or practice of persecution. Courts have found that Roma who face similar deprivations, discrimination, and marginalization in other European counties do not face a pattern or practice of persecution. As the Court of Appeals for the Seventh Circuit has explained: "There is no doubt that the Roma are victims of pervasive discrimination in employment, education, health care, and housing, and are occasionally the targets of violence. But there is no indication that the Bulgarian government sanctions this conduct."[12]

Ciupangel argues that the Roma in Romania suffer from economic disadvantages and deprivations to a greater degree than members of the Romanian majority in Romania. We have no reason to doubt that assertion. However, by way of comparison, we have held that:

> In the aggregate, a fine of more than a year and a half's salary; blacklisting from any government employment and from most other forms of legitimate employment; the loss of health benefits, school tuition, and food rations; and the confiscation of household furniture and appliances from a relatively poor family constitute deliberate imposition of severe economic disadvantage which could threaten [the] family's freedom if not their lives.[13]

---

[12] *Georgieva v. Holder*, 751 F.3d 514, 523 (7th Cir. 2014) (internal citation omitted).
[13] *Li*, 400 F.3d at 169.

This record does not establish that the deprivations that Romani face reach that level.[14]

For example, while in Romania, Ciupangel completed high school and received a vocational education. He was also able to find work in the form of "day jobs."[15]

We do want to emphasize that we do not doubt that Romani face widespread discrimination in Romania, and we are not unsympathetic to the deplorable conditions and discrimination they face. However, the law does not allow us to conclude that the BIA erred in concluding that those deprivations do not amount to threats to life or freedom in the asylum context.

## II.

For the foregoing reasons, we must therefore deny Ciupangel's petition for review of the BIA and IJ's decision.

---

[14] Ciupangel provides that "72% of [the Romani] have no drinking water at home, 59% live in segregated neighborhoods, 27% receive education in segregated schools, and [the Romani] have a life expectancy that is *seven years* less than the general population." Petitioner's Br. at 19 (emphasis in original). While these conditions are deplorable, they do not rise to the level described in *Li*.

[15] App. 44.